699 F.2d 1219
 226 U.S.App.D.C. 67
 ITT WORLD COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Southern Pacific Communications Company, RCA Global
Communications, Inc., Intervenors.
ITT WORLD COMMUNICATIONS, INC.
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellant.
ITT WORLD COMMUNICATIONS, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION.
 Nos. 80-1721, 80-2324 and 80-2401.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 16, 1982.
Decided Feb. 1, 1983.
 
 Petition for Review of an Order of the Federal Communications Commission and Appeals from the United States District Court for the District of Columbia (D.C.Civil Action No. 80-0428).
 Grant S. Lewis, New York City, with whom John S. Kinzey and Howard A. White, New York City, were on the brief for ITT World Communications, Inc., petitioner-appellant in 80-1721 and 80-2401 and cross-appellee in 80-2324. Samuel J. Abate, New York City, also entered an appearance in 80-1721 and Eugene R. Fidell, Washington, D.C., also entered an appearance in 80-2324 and 80-2401.
 Gregory M. Christopher, Counsel, F.C.C., Washington, D.C., for respondents. Stephen A. Sharp, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, John E. Ingle, Deputy Associate Gen. Counsel, Nancy E. Stanley, Asst. Gen. Counsel, Jane E. Mago, Counsel, F.C.C., and Barry Grossman and Marion L. Jetton, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents in 80-1721. Robert R. Bruce, John P. Greenspan, and Keith H. Fagan, Attys., F.C.C., Washington, D.C., also entered an appearance for respondents in 80-1721.
 Frank A. Rosenfeld, Atty., Dept. of Justice, Washington, D.C., with whom Charles F.C. Ruff, U.S. Atty., Washington, D.C., at the time the brief was filed, and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellee in 80-2401 and cross-appellant in 80-2324.
 Alexander P. Humphrey, Washington, D.C., entered an appearance for intervenor, RCA Global Communications, Inc., in 80-1721.
 John V. Kenny, Washington, D.C., entered an appearance for intervenor, Southern Pacific Communications Co., in 80-1721.
 Before TAMM and MIKVA, Circuit Judges, and BAZELON, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge BAZELON.
 TABLE OF CONTENTS
 Page
Introduction ................................... 1223
 I. BACKGROUND ............................... 1224
 A. The Closed CP Meetings ............... 1224
 B. The Rulemaking Proceeding ............ 1226
 C. The District Court Action ............ 1228
 II. THE ULTRA VIRES COUNT .................... 1229
 A. Subject Matter Jurisdiction .......... 1229
 B. Standing ............................. 1231
 C. Ripeness ............................. 1232
III. THE FOIA COUNT ........................... 1233
 A. Material Pertaining to Commission
 Docket Proceedings ................... 1234
 B. Material Preparatory to the CP
 Discussions .......................... 1236
 C. Material Reporting the CP
 Discussions .......................... 1238
 IV. THE SUNSHINE ACT COUNT ................... 1239
 A. The Authorization Requirement ........ 1240
 B. "Conduct or Disposition of Official
 Agency Business" ..................... 1241
 1. "Official Agency Business" ........ 1241
 2. Meetings "of" the Agency .......... 1242
 3. "Informal Background
 Discussions" ..................... 1243
 C. Policy Arguments ..................... 1244
 V. THE RULEMAKING DENIAL .................... 1245
 A. The Sunshine Act ..................... 1246
 B. The Commission's Authority ........... 1246
 C. Delegation of Authority to the
 Telecommunications Committee ......... 1248
CONCLUSION ..................................... 1249
 BAZELON, Senior Circuit Judge:
 
 
 1
 These appeals present a variety of important questions arising under the Communications Act of 1934,[1] the Freedom of Information Act ("FOIA"),[2] the Government in the Sunshine Act ("Sunshine Act"),[3] and the Administrative Procedure Act ("APA").[4] The issues all grow out of a series of international conferences organized by the Federal Communications Commission ("FCC" or "Commission"). Since 1974, the FCC's Telecommunications Committee ("Committee") has periodically met with representatives of foreign telecommunications administrations and carriers to discuss matters of common concern, particularly the planning of shared facilities. These gatherings, known as "consultative process" ("CP") meetings, have routinely been transcribed and open to all interested parties, including representatives of American carriers. Beginning late in 1979, however, the Committee moved to expand the focus of the CP meetings and to exclude American carriers from the expanded discussions.[5]
 
 
 2
 One of the excluded carriers, ITT World Communications, Inc. ("ITT"), has since engaged in a two-front campaign to have these meetings reopened. The present appeals concern both prongs of that campaign. In Numbers 80-2324 and 80-2401, ITT appeals a judgment of the district court dismissing its complaint that the Committee's actions at the closed meetings are ultra vires. The Commission cross-appeals accompanying judgments rendered against it under FOIA and the Sunshine Act.[6] In Number 80-1721, ITT petitions for review of a Commission order denying its petition for a rulemaking that would establish regulations governing the conduct of the CP.[7]
 
 For the reasons set forth below, we
 
 3
 (1) reverse the district court's dismissal of ITT's ultra vires complaint and remand for further proceedings;
 
 
 4
 (2) affirm in part, reverse in part, and remand in part the district court's order directing the Commission to disclose all materials identified in response to ITT's FOIA request;
 
 
 5
 (3) affirm the district court's determination that the CP meetings are governed by the provisions of the Sunshine Act; and
 
 
 6
 (4) reverse in part and remand in part the Commission's rulemaking denial.I. BACKGROUND
 
 A. The Closed CP Meetings
 
 7
 International record service[8] has long been dominated, at the American end, by four firms known as the International Record Carriers ("IRCs").[9] ITT is one of those carriers.[10] In an effort to foster greater competition in this field,[11] the Commission in 1977 authorized two smaller common carriers, GTE Telenet Communications Corp. ("Telenet") and Graphnet Systems, Inc. ("Graphnet"), to offer specialized international service.[12] The Commission's competition policy, however, has met a formidable obstacle: American carriers obviously cannot provide international service without links to correspondent carriers abroad,[13] and to date Telenet and Graphnet have been unable to secure interconnection agreements with European administrators.[14] The foreign administrations apparently oppose greater competition in the private sector, preferring instead to deal exclusively with the established American carriers.[15]
 
 
 8
 In response, the Commission in 1979 turned to the consultative process as a forum for encouraging foreign cooperation with the newly authorized carriers. The CP had been initiated five years earlier as a means to exchange and discuss technical information related to the operation of jointly owned communications facilities; meetings were transcribed and open to all interested parties.[16] At the October 1979 CP meeting in Dublin, Ireland, however, the Telecommunications Committee persuaded its foreign counterparts to expand the meeting's focus to include "the United States' authorization of new telecommunications services and carriers," and to exclude representatives of American carriers from this part of the meeting.[17] In addition to the Dublin meeting, a February 1980 meeting in Ascot, England, and an October 1980 meeting in Madrid, Spain, were closed during discussions of this topic.
 
 
 9
 The specific nature of these off-the-record discussions is sharply contested and cuts to the heart of these appeals. Conceding that "international negotiation is the province of the State Department,"[18] the Commission characterizes the closed encounters as merely "informal talks" that, like the public CP meetings, facilitate "the exchange of information and views."[19] More precisely, the sessions are designed "to improve foreign understanding of the bases for and the nature of our pro-competition policies and, at the same time, to increase our knowledge of any unique telecommunications problems or policies which may exist in a particular country."[20] According to the Commission, the Committee does not officially lobby on the Commission's behalf: To the extent that "some commissioners have encouraged the foreign entities to cooperate with the policies of the FCC," as opposed to merely informing them of Commission policies, "these comments represent the personal views of the Commissioners, not official agency policy ...."[21]
 
 
 10
 ITT argues that the Committee's efforts at the closed meetings constitute negotiation, and there is considerable evidence that would appear to contradict the Commission's characterization of the discussions as mere unofficial "information exchanges." First, the Commission concedes that Committee members attend CP meetings in their official capacities,[22] and indeed argues that their attendance is necessary to discharge its statutory duty to regulate international communications.[23] Second, Commission representatives have described the closed exchanges as a "mechanism" to "narrow differences and to move toward consensus ... on common principles and approaches";[24] the Commission acknowledges that such consensus is designed to "lead ultimately to operating agreements for ITT's competitors."[25] Finally, ITT presents evidence that the Commission has used the meetings as a forum to advise foreign administrations of a linkage between their cooperation with the newly authorized American carriers and the Commission's receptivity to their needs in other areas.[26]
 
 B. The Rulemaking Proceeding
 
 11
 ITT filed a petition for rulemaking on October 29, 1979. After questioning the Commission's authority to meet privately with foreign administrations on behalf of individual American carriers, ITT proposed that if such contacts continue they should be governed by published rules of policy and procedure. Such rules, it argued, are necessary to guard against Commission prejudgment of pending and future proceedings, to protect against ex parte influences, to ensure an effective record for judicial scrutiny of any disputes growing out of the meetings, and generally to enhance the quality of the CP exchanges.
 
 
 12
 ITT characterized its proposed rules as addressed to "the what" and "the how" of CP meetings.[27] With respect to "the what," ITT proposed that the Commission (1) "expressly disclaim[ ] any intention to negotiate with foreign administrations";[28] (2) delineate the authority of commissioners attending CP meetings; and (3) direct commissioners to refrain from discussing pending proceedings at the meetings or "advancing the interest of one American carrier or service at the expense of any other."[29] With respect to "the how," ITT proposed that the Commission (1) require the transcription or recording of all CP meetings; (2) open the meetings to the public in accordance with the requirements of the Sunshine Act; (3) provide comprehensive notice-and-comment procedures prior to the meetings;[30] and (4) provide an opportunity for interested parties to make oral or written presentations at the meetings.
 
 
 13
 After receiving comments and reply comments,[31] the Commission on May 2, 1980, released its order denying ITT's petition. The Commission addressed itself to four issues:
 
 
 14
 (1) whether the Commission has engaged in "negotiations"; (2) whether the Commission has statutory power to make any contacts with foreign governments or telecommunications entities; (3) whether the Government in the Sunshine Act is applicable; and (4) whether there are ex parte and other due process questions involved here.[32]
 
 
 15
 The Commission devoted a substantial part of its discussion to the first issue. Characterizing the closed discussions as "[i]nformal talks ... to improve foreign understanding,"[33] it insisted that it had not ventured "into the area of formal international negotiation."[34] According to the Commission, negotiation "connotes a formal diplomatic process for the development and formulation of various kinds of binding executive agreements and treaties."[35] The parties at the CP meetings, however, have not formulated such accords. Moreover, "participants in such negotiations ordinarily have authority to speak for their respective countries and to commit them," subject to formal ratification procedures.[36] The Telecommunications Committee, on the other hand, has no authority to bind our government to any agreements. This lack of negotiating authority, the Commission added, is clearly understood by foreign administrations.
 
 
 16
 Turning to its authority to engage in informal talks, so construed, the Commission concluded that "contacts with foreign administrations are not only permissible but are encouraged by the Communications Act."[37] Citing sections in the Act that grant it authority to license international communication by wire and radio,[38] the Commission characterized the discussions as a means to "advance our progress toward realization of statutory goals" and as "a necessary and natural corollary" of its statutory authority.[39]
 
 
 17
 The Commission then considered whether the CP discussions are "meetings" within the meaning of the Sunshine Act. The Act defines a "meeting" as "the deliberations of at least the number of individual agency members required to take action on behalf of the agency where such deliberations determine or result in the joint conduct or disposition of official agency business."[40] The Commission concluded that, for two reasons, this definition does not encompass the consultative process. First, the presence of at least four of the seven commissioners--a quorum--is required for the Commission to transact business, unless it delegates authority pursuant to 47 U.S.C. Sec. 155(d)(1) (1976).[41] The Commission has not delegated authority to the Committee to act on its behalf at the CP sessions, however, and because only three commissioners sit on the Committee, the threshold requirement of an authorized quorum has not been met. Second, because informal exchanges of information are not a "deliberative process," the Committee's activities do not constitute "the joint conduct or disposition of official agency business."
 
 
 18
 The Commission concluded that "[m]ost of ITT's remaining arguments are in reality addressed to the advisability, rather than the legality, of informal discussions with foreign administrations."[42] It labelled ITT's prejudgment and ex parte arguments as "speculative," and argued that existing rules adequately protect against these dangers.[43]
 
 
 19
 The Commission did, however, announce that as a discretionary matter it would (1) provide a notice-and-comment period on the time and place of each individual meeting, the persons expected to attend, and the topics to be discussed; (2) open the meetings to observers "unless it is determined that circumstances exist which warrant closure";[44] and (3) hold public briefings before and after the meetings. The Commission emphasized that "[t]hese procedures are flexible, and we expressly reserve the right to depart from them where necessary to accommodate any special circumstances which may arise with respect to a specific conference."[45]
 
 
 20
 This petition for review followed. ITT maintains that the Commission's order denying its rulemaking petition is arbitrary, capricious, an abuse of discretion, and contrary to law.
 
 C. The District Court Action
 
 21
 ITT filed this action on February 12, 1980, while the Commission was considering its rulemaking petition.[46] Its complaint asserts three claims for relief:
 
 
 22
 Count I ("the ultra vires count") alleges that the Commission has used the closed CP meetings to negotiate with foreign governments on behalf of ITT's competitors, and it asserts that the alleged negotiations "are unlawful and ultra vires, and in excess of the authority conferred on the FCC by the Communications Act."[47] The count asks for declaratory and injunctive relief.
 
 
 23
 Count II ("the FOIA count") seeks disclosure under FOIA of a number of documents pertaining to the regulation of international record service.
 
 
 24
 Count III ("The Sunshine Act count") alleges that the Telecommunications Committee's participation in the closed CP discussions violates the Sunshine Act's open meeting rules.
 
 
 25
 The Commission moved for dismissal or summary judgment, and ITT cross-moved for summary judgment on the FOIA and Sunshine Act counts. The district court (1) dismissed the ultra vires count, holding that ITT did not have standing to secure judicial review and that the issue was not ripe for adjudication; (2) granted ITT's motion for summary judgment on the FOIA count, holding that the Commission had failed to substantiate its claim of "deliberative process" privilege with respect to the disputed documents; and (3) granted ITT's motion for summary judgment on the Sunshine Act count, holding that the CP discussions are "meetings" within the meaning of the Act.
 
 
 26
 ITT appeals the district court's dismissal of the ultra vires count. The Commission cross-appeals the court's summary judgment on the FOIA and Sunshine Act counts. Because our review of the district court action sheds considerable light on issues presented by the rulemaking denial, we first consider in turn the three counts of ITT's complaint.
 
 II. THE Ultra Vires COUNT
 
 27
 The district court "seriously doubt[ed]" whether it had subject matter jurisdiction over the ultra vires count.[48] It did not reach this issue, however, dismissing instead on standing and ripeness grounds. We conclude that the district court's reservations about its jurisdiction were unfounded and that it erred in its rulings on standing and ripeness.
 
 A. Subject Matter Jurisdiction
 
 28
 ITT argues that the district court has jurisdiction to hear the ultra vires claim under 28 U.S.C. Sec. 1331 (1976 & Supp. V 1981), the general grant of federal question jurisdiction. The Commission counters that jurisdiction over the issue lies exclusively with this court as part of our review of the order denying ITT's petition for rulemaking. Invoking 28 U.S.C. Sec. 2342(1) (1976) and 47 U.S.C. Sec. 402(a) (1976), which together grant exclusive jurisdiction to review FCC final orders to the courts of appeals, the Commission argues that the ultra vires count is a collateral attack against that part of its order defining the scope of its authority to meet with foreign administrations. District court intervention, the Commission contends, would therefore circumvent the prescribed review procedure and require an "unwarranted duplication of the work of the Court of Appeals."[49]
 
 
 29
 A strong presumption against concurrent district court jurisdiction would be appropriate if the issues presented by ITT's rulemaking petition and its ultra vires count were indeed identical.[50] The Commission's argument, however, blurs an important distinction between the rulemaking petition and the ultra vires count. The petition asked the Commission for a declaration of the nature of its authority with respect to the CP meetings and argued that "negotiation" is outside the scope of that authority. The Commission fully agreed that it has no authority to negotiate, but it disagreed as to the necessity of rules spelling out this lack of authority with greater clarity. The gravamen of the ultra vires count is very different. There ITT asserts that the Commission, irrespective of what it acknowledges as the proper scope of its authority, has in fact secretly exceeded that authority and will not admit to having done so. Contrary to the Commission's argument that "[t]he specific content of the CP meetings is only evidence for [the] general issue" of the scope of its authority,[51] the "content" of the meetings is itself the issue.
 
 
 30
 We have emphasized that the jurisdiction of the district courts is properly invoked where de novo judicial factfinding is necessary for a fair examination of the disputed issues.[52] The instant controversy presents a paradigm of this circumstance. Rather than call for review of an agency action that has itself been embodied in a record, the ultra vires count requires scrutiny of conduct occurring outside the formal administrative process. The agency "record" in the rulemaking denial, which consists simply of the Commission's conclusory assertions that it has not negotiated and of certain statements by Commission officials that contradict these assertions, is manifestly inadequate for such an evaluation.[53] ITT's colorable ultra vires claim can therefore be tested only through the kind of independent, de novo factfinding appropriate in the district court.[54]
 
 
 31
 The Commission seems to argue, however, that even if its instant order does not provide a suitable vehicle for review, future agency actions based on its alleged ultra vires conduct would, so that district court intervention would nevertheless be unwarranted. Thus, the Commission asserts that if it "take[s] some action detrimental to ITT in the future, as a quid pro quo for European cooperation today," ITT "would have the opportunity ... to challenge that action and its basis" in a statutory review proceeding.[55]
 
 
 32
 Again, however, the Commission misstates the focus of ITT's allegations. Where an agency action is not reviewable in the courts of appeals, district court jurisdiction may nevertheless be inappropriate if the action is interlocutory in nature and can be corrected on court-of-appeals scrutiny of a subsequent, final action.[56] We have emphasized, however, that such preclusion of district court review is inappropriate where the challenged action would be "beyond the capabilities of the statutorily-prescribed methods of review to repair."[57] Such a danger of "irretrievable subversion" of ITT's "substantial rights"[58] is readily apparent in this case. The Committee's activities at the CP meetings are not calculated to result in a final order, but rather to lead to unreviewable action by foreign administrations. Thus, as we discuss more fully in Part II-C below, subsequent judicial or administrative proceedings would not likely provide an adequate remedy for the Commission's alleged misconduct. The district court therefore has subject matter jurisdiction over the ultra vires count.[59]B. Standing
 
 
 33
 Under the Administrative Procedure Act, a party has standing to secure judicial review of any "agency action" that causes a "legal wrong."[60] The district court held that ITT has not suffered a legal wrong, reading its complaint solely to allege a violation of the Logan Act's prohibition of unauthorized negotiation with foreign governments.[61] Because only the Department of State is aggrieved by violations of that criminal statute, the court reasoned, ITT's alleged injury is not legally cognizable.
 
 
 34
 We respectfully conclude that the district court misread ITT's complaint. The gravamen of ITT's allegation is quite specific: "The activities of the FCC ... are unlawful and ultra vires, and in excess of the authority conferred on the Commission by the Communications Act."[62] Whether the complaint's two references to the Logan Act[63] should be construed as an attempt to state a separate cause of action (as the Commission insists) or as mere illustrative matter not intended to assert a claim (as ITT argues), a cause of action under the Communications Act has clearly been alleged.
 
 
 35
 As a regulated carrier, ITT has standing to complain of ultra vires Commission actions that threaten it with competitive injury.[64] If ITT's allegations are correct,[65] the Commission is engaged in a course of conduct that clearly rises to the level of reviewable "agency action."[66] If successful, that action will cause substantial injury to ITT's economic interests.[67] Moreover, there can be no question that the interests sought to be protected by ITT are within the Communications Act's broad zone of protected interests.[68] The Commission's argument that ITT has no right to avoid enhanced competition misses the mark. ITT has standing to insist that the Commission implement its competition policy in a manner that does not exceed its authority under the Communications Act.[69]
 
 C. Ripeness
 
 36
 The district court held that the ultra vires count was not ripe for adjudication, reasoning that "[t]he two new carriers have not yet been accepted by the foreign entities. When and if they are so accepted, Plaintiff can object through the formal rulemaking process, and derive relief if its claim is cognizable and meritorious."[70]
 
 
 37
 This holding is flawed under familiar ripeness doctrine, which requires an evaluation of (1) "[t]he fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration."[71] The Committee has already engaged in three closed meetings with foreign administrations. The threatened injury to ITT resulting from these encounters does not depend on other types of Commission action. The issue whether the Committee's efforts at the meetings were unlawful is therefore eminently fit for judicial consideration.
 
 
 38
 Moreover, contrary to the district court's reasoning, a subsequent judicial proceeding would not likely provide an adequate remedy for the Commission's alleged misconduct.[72] Actions by foreign administrations obviously could not be overturned in American fora, and the new carriers' certificates of public convenience and necessity, awarded before the Committee began to meet privately with foreign administrations, could not be revoked on the basis of subsequent Commission misdeeds. In addition, prospective rulemaking after the foreign administrations had acted could not undo the harm that ITT seeks to prevent: coerced entry of foreign administrations into agreements with Telenet and Graphnet. The ultra vires issue is therefore ripe for judicial consideration.[73]
 
 III. THE FOIA COUNT
 
 39
 Three days after the first closed meeting in Dublin, ITT requested the Commission to identify and release all agency communications "with respect to dealings or possible dealings between foreign correspondents and U.S. carriers not now providing international services through direct connections with foreign correspondents."[74] The Commission released eight items but withheld fifteen others.[75] After exhausting its administrative remedies,[76] ITT brought this action to compel disclosure of those items.
 
 
 40
 The Commission relies exclusively on the executive "deliberative process" privilege embodied in 5 U.S.C. Sec. 552(b)(5) (1976) ("Exemption 5"), which protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with an agency."[77] To sustain its burden of proof,[78] the Commission submitted an index to the documents, five affidavits, and a memorandum of points and authorities.[79]
 
 
 41
 The fourteen items still being withheld[80] fall into three broad categories:
 
 
 42
 (A) Seven items do not pertain directly to the CP meetings, but instead to specific docket proceedings concerning carrier authorizations and facilities planning.[81]
 
 
 43
 (B) Six items are background memoranda and draft statements for the use of commissioners in their contacts with foreign administrations.[82]
 
 
 44
 (C) One item is a compilation of staff members' notes reporting the substance of the CP discussions in Dublin.[83]
 
 
 45
 The district court granted ITT's motion for summary judgment and ordered the Commission to release all fourteen items. The court's analysis was limited to one short paragraph:
 
 
 46
 In the instant case, the FCC cites no specific policy or process in order to protect the documents in question. In fact, they [sic] consistently defend the Consultative Process as a means of receiving information without having to formulate policy or utilize United States regulatory jurisdiction.... Upholding the use of Exemption 5 in the instant case "would go a long way toward undercutting the entire Freedom of Information Act," ... and detract from the Act's dominant objective of disclosure.... The documents at issue herein must be disclosed.[84]
 
 
 47
 We have recurrently emphasized that "District Court decisions in FOIA cases must provide statements of law that are both accurate and sufficiently detailed to establish that the careful de novo review prescribed by Congress has in fact taken place."[85] Our review of the materials submitted by the Commission leads us to conclude that the district court's evaluation of the instant items did not reflect the quality of de novo review required by this standard. With respect to the documents listed in categories (A) and (B), we accordingly reverse the district court's disclosure order and remand for additional de novo proceedings.[86] Our decision does not apply to item 7, however, for we conclude that the Commission failed to carry its burden of establishing its right to withhold any of the material therein. Turning to the item listed in category (C), we conclude that the Commission has failed to carry its burden of proof, and we accordingly affirm the district court's disclosure order with respect to that item.
 
 
 48
 A. Material Pertaining to Commission Docket Proceedings
 
 
 49
 With one exception, each of these seven items was prepared by staff attorneys or engineering assistants to advise Commission officials on pending docket proceedings.[87] Item 4 is a legal analysis of the "Applicability of Resale Decision to international communications market," and gives advice and opinions on the applications of Graphnet and Telenet to extend their services to overseas markets.[88] Item 9 recommends how the Commission should modify the Graphnet authorization to comply with a recent judicial decision.[89] Item 11 advises a commissioner how he should vote on a proposed authorization of a new transatlantic communications cable.[90] Item 12 contains similar recommendations regarding Commission authorization of a new communications satellite.[91] Item 13 contains, inter alia, recommendations on factors the Commission should consider when ruling on carrier applications, and analyses of issues raised by carriers in pending docket proceedings.[92] Item 14 analyzes a tariff filing by the American Telephone and Telegraph Company and recommends how the Commission should respond.[93] Item 15 contains recommendations on whether the Commission should have a national security briefing by the Department of Defense in connection with a proposed transatlantic cable authorization.[94]
 
 
 50
 With respect to these items, the district court's sweeping assertion that "the FCC cites no specific policy or process in order to protect the documents"[95] is clearly erroneous. The items bear all the indicia of predecisional status.[96] They were written by subordinate agency personnel to advise Commission officials on issues presented in pending docket proceedings. The authors themselves had no decisionmaking authority; their memoranda were "recommendatory" and "deliberative in nature, weighing the pros and cons of agency adoption of one viewpoint or another."[97] The items contain suggestions that could "be freely disregarded";[98] rather than expressing "the law itself," they simply contain "the ideas and theories which go into the making of the law."[99] Thus, the deliberative material in these items is without "precedential significance" and cannot be considered "secret law."[100] Finally, the Commission did not expressly adopt any of the material in these items when it issued its final decisions in the relevant proceedings.[101]
 
 
 51
 We therefore reverse the district court's judgment ordering the disclosure of items 4, 9, 11, 12, 13, 14, and 15. In accordance with previous cases, we remand to the district court for de novo factual determinations of two segregability issues.[102]
 
 
 52
 First, the deliberative process privilege does not protect "purely factual material appearing in ... documents in a form that is severable without compromising the private remainder of the documents."[103] On remand, the district court must ensure that only deliberative material in these items is withheld.
 
 
 53
 Second, the privilege does not protect material that merely sets forth official agency views and practices with respect to the interpretation and implementation of existing policies.[104] To the extent that some of the material in these items may " 'embody the agency's effective law and policy,' "[105] the district court must be certain that it is excised and released.
 
 
 54
 These determinations may well require the district court to "examine the contents of [the items] in camera to determine whether such records or any part thereof shall be withheld" under Exemption 5.[106] The court should also take care to provide a sufficiently detailed analysis to enable thorough appellate review.
 
 
 55
 B. Material Preparatory to the CP Discussions
 
 
 56
 There are six items in this category. Items 2 and 3 are drafts of telexes sent by Commission Chairman Charles Ferris to his Swedish and Canadian counterparts.[107] Items 5, 7, 8, and 10 are background memoranda for the use of commissioners attending the CP meetings, and are generally claimed to contain "recommendations" and "options" on issues to be discussed, and "proposed responses should the parties reject" Commission proposals.[108]
 
 
 57
 ITT argues, and the district court agreed, that because the Commission contends that the CP meetings themselves are not deliberative or decisional in nature, material preparatory to the meetings cannot be withheld. We agree that the Commission has engaged in much obfuscation about the substance of these discussions. It has, however, consistently stated that the meetings involve the exchange of information and views concerning its competition policy. There is an important distinction between the commissioners' actual statements and the drafts and background memoranda from which those statements emerged. The commissioners' remarks were statements of proposed action[109] and explanations of agency positions[110] that, as we discuss below, are not exempt from disclosure.[111] The instant items, on the other hand, are the raw materials that went into the formulation of those remarks. Like the items discussed in part III-A, they are documents from subordinates to superiors that are merely recommendatory in nature.[112] We have held that "internal self-evaluation[s] ... about the relative merits of various positions which might be adopted" in agency dealings with the public normally fall within the deliberative privilege; this protection extends to "discussion of the merits of past efforts, alternatives currently available, and recommendations as to future strategy."[113]
 
 
 58
 Moreover, the policies behind the deliberative privilege apply in full force to this advisory material. Disclosure might well discourage subordinates from "provid[ing] ... their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism."[114] Disclosure might also "confus[e] the issues and mislead[ ] the public by ... suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action."[115]
 
 
 59
 We therefore reverse the district court's disclosure order with respect to most of these items. We have examined the final telex that resulted from the drafts in item 2;[116] it consists entirely of policy proposals, and we see no purpose in remanding for further factual findings. With respect to items 3, 5, 8, and 10, however, we remand to the district court for segregability determinations in accordance with our discussion in Part III-A.
 
 
 60
 We emphasize an important caveat. A consistent assumption running through judicial decisions permitting nondisclosure of deliberative material has been that the actual policy or legal positions adopted will be disclosed to the public.[117] The district court should be certain that the disclosed documents and other material will provide the public a sufficient view of the Committee's efforts at the CP meetings. If they do not, release of some of the material in these items, to the extent that it reflects positions actually taken, may well be necessary to give the public an adequate understanding of the Committee's activities.
 
 
 61
 Our decision does not apply to item 7.[118] The affidavit submitted by its author stated simply that the document "contained my thoughts on what information would be useful to the Commissioners in discussing" two issues at the Dublin conference.[119] This characterization could easily extend to simple summaries of factual information, which, as we discuss below, are not exempt from FOIA disclosure.[120] The Commission therefore failed to carry its burden of establishing any right to withhold this document,[121] and we affirm the district court's judgment ordering its disclosure.
 
 C. Material Reporting the CP Discussions
 
 62
 Item 1 is a compilation of staff members' notes reporting the substance of the closed CP exchange at Dublin.[122] We affirm the district court's decision that this material must be released.
 
 
 63
 Communications between agency members and persons from outside the agency generally are not protected by the deliberative process privilege.[123] Because these notes embody such communications, they cannot acquire predecisional status simply by virtue of being circulated within the agency. Moreover, reports of extra-agency discussions are factual in nature; courts have long emphasized that factual material usually is not exempt from disclosure.[124] And unlike the background evaluative material discussed above, commissioners' comments that may be reported in these notes are actual explanations of the Commission's policies and actions. Although the public has only a marginal interest in the release of inter-Commission material debating positions to be taken at international conferences, it has a substantial interest in knowing the positions that Committee members actually take.[125]
 
 
 64
 The Commission advances three rationales against disclosure. First, it argues that "[s]uch notes are evaluative, because the persons making them were not secretaries or other neutral observers, but were FCC staff attorneys, who can be expected to write down only those comments made by speakers at the meeting that they feel are significant."[126] This argument is similar to one we recently considered--and rejected--in Playboy Enterprises, Inc. v. Department of Justice.[127] In that case, the government argued that a Justice Department investigative report reflected the "choice, weighing and analysis of facts," and was therefore protected from disclosure by the deliberative privilege.[128] We responded:
 
 
 65
 Anyone making a report must of necessity select the facts to be mentioned in it; but a report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material. If this were not so, every factual report would be protected as a part of the deliberative process.[129]
 
 
 66
 Like Playboy Enterprises, this case is distinguishable from suits seeking disclosure of staff summaries of record evidence in adjudicatory and rulemaking proceedings.[130] The courts in such cases have found that, where analyses are prepared for the sole purpose of evaluating the relative factual merits of different positions in pending proceedings, disclosure would invite "probing [of] the decision-making process itself."[131] Here, on the other hand, the Commission has cited no specific pending proceeding for which the notes were compiled, and in any event it has presented no evidence that the notes are evaluative in nature rather than straightforward factual narrations.
 
 
 67
 The Commission argues, however, that the notes "may be used by the staff in making recommendations to the Commissioners concerning future consultative meetings."[132] We have rejected this sort of sweeping argument before. Such an interpretation would "swallow up a substantial part of the administrative process" and "would result in a huge mass of [factual] material being forever screened from public view."[133] It is not enough for an agency to assert that factual material "may be used" in future deliberations; the agency must demonstrate that the material at issue is inextricably intertwined with a specific deliberative proceeding.[134]
 
 
 68
 Finally, the Commission asserts that these notes are protected by the "related governmental privilege" that protects "information provided to the government by persons who would not provide information unless given a promise of confidentiality."[135] We need not consider the scope of this exemption,[136] however, for the Commission provided no evidence to the district court that confidential treatment had actually been promised to the foreign participants or that the foreigners would not otherwise have met with the Committee to discuss the Commission's competition policy.[137]
 
 IV. THE SUNSHINE ACT COUNT
 
 69
 The Government in the Sunshine Act is grounded on the principle that "the public is entitled to the fullest practicable information regarding the decisionmaking processes of the Federal Government."[138] Accordingly, the Act requires that all meetings of multi-member agencies be open to public observation.[139] Meetings may be closed, however, where they would likely involve the discussion of information protected from disclosure under one or more of ten narrowly defined exemptions.[140]
 
 
 70
 The sole question presented in this count is whether the consultative process exchanges are "meetings" within the meaning of the Act. On cross-motions for summary judgment, the district court held that they are. We conclude that there are no genuine issues of material fact, and we affirm. The public may therefore be excluded from these discussions only in accordance with the Act's stringent closure provisions.
 
 
 71
 The Sunshine Act defines a "meeting" as "the deliberations of at least the number of individual agency members required to take action on behalf of the agency where such deliberations determine or result in the joint conduct or disposition of official agency business."[141] Under the Act, the Commission bears the burden of demonstrating that this definition does not encompass the CP discussions.[142] It has advanced three arguments, which we consider in turn.
 
 A. The Authorization Requirement
 
 72
 To be a meeting covered by the Sunshine Act, a gathering must include "at least the number of individual agency members required to take action on behalf of the agency."[143] This language requires the presence of either a quorum of the full agency or a quorum of a "subdivision ... authorized to act on behalf of the agency."[144] Although it is undisputed that a quorum of the Telecommunications Committee attends the CP exchanges, the Commission argues that it has not "authorized" the Committee to "act" on its behalf at the discussions. Because such an authorization could only be accomplished through an express delegation of power pursuant to 47 U.S.C. Sec. 155(d)(1) (1976),[145] the Commission contends, the threshold requirement of an authorized quorum has not been met.
 
 
 73
 We disagree. The applicability of the Sunshine Act manifestly cannot turn on whether an agency has in fact followed proper procedures for delegating authority to a subdivision, for the requirements of the Act could otherwise be evaded at will. The Commission concedes in the instant case that (1) Committee members attend CP exchanges in their "official roles";[146] (2) their goal is to build a "consensus" that will "lead ultimately to operating agreements for ITT's competitors";[147] and (3) they convey the information and views "exchanged" at the meetings to the full Commission for its consideration.[148] Indeed, the Commission insists in its rulemaking denial that the Committee's participation in the meetings is necessary for the Commission to carry out its statutory duty to regulate international communications.[149] Whatever the actual scope of the Committee's endeavors, there can therefore be no question that they are undertaken "on behalf of" the Commission.
 
 
 74
 B. "Conduct or Disposition of Official Agency Business"
 
 
 75
 A more difficult question is whether the Committee's efforts are "deliberations [that] determine or result in the joint conduct or disposition of official agency business."[150] The statutory language is ambiguous. "Deliberations" might be read narrowly to encompass solely the internal process of weighing and examining proposals that precedes a formal decision by the agency. On the other hand, "conduct ... of official agency business" suggests a much broader range of activity, including, inter alia, hearings and meetings with outsiders.
 
 
 76
 The Commission advances three arguments, based on the statutory language and the legislative history, in support of the narrow interpretation.
 
 
 77
 1. "Official Agency Business"
 
 
 78
 The Commission argues that the Committee does not transact "official agency business" at the meetings; members participate solely to "exchange information and views," and not to vote, "negotiate," or otherwise engage in a " 'rump' FCC meeting."[151] The Reports of the House and Senate Committees on Government Operations, however, clearly demonstrate that "official agency business" encompasses far more than simply "agency actions" of the sort reviewable under the APA.[152] The Senate Report, for example, states that "[i]n addition to business meetings of the agency," the definition of a covered meeting "includes hearings and meetings with the public."[153] Similarly, both Reports indicate that subdivisions are covered by the Act where they are "authorized to submit recommendations, ... or to conduct hearings on behalf of the agency."[154] So long as hearings and meetings with outsiders result in the actual conduct of official business, agencies cannot avoid the openness requirements where they are otherwise subject to the Act.
 
 
 79
 The Commission has advanced no reason to distinguish the discussions at issue from "hearings" or "meetings with the public." There can be no question, moreover, that the closed discussions involve agency business of the first import. These encounters play an integral role in the Commission's policymaking processes in at least two ways. First, the Commission has emphasized that the meetings are an important means for gathering information and opinions from foreign administrations, and that this material is essential in its deliberations regarding the future structure of international telecommunications.[155] The Act extends to subdivisions' activities that result in the submission of "recommendations," and we agree with the district court that the Commission has failed to rebut the common-sense presumption that the Committee's activities are, at least in part, evaluative and recommendatory in nature.[156] Second, the success of the Commission's established competition policy depends on its achieving a "consensus" and "favorable climate" with foreign administrations,[157] and the agency has chosen the CP as the vehicle to assist Graphnet and Telenet in obtaining interconnection agreements. The broad sweep of the Sunshine Act does not support a distinction between an agency's predecisional activities and its postdecisional efforts to implement, interpret, and promote its policies. Both are important components of "official agency business."
 
 2. Meetings "of" the Agency
 
 80
 The Commission argues, however, that the CP discussions are not meetings of the Committee, but simply meetings attended by the Committee. Put another way, the discussions do not involve the "joint" conduct of business among Committee members, but rather exchanges between the Committee and outside parties.
 
 
 81
 Again, this argument fails to overcome the presumption that agency hearings and meetings with outsiders be open to public observation. An agency cannot avoid this requirement through the facile expedient of having an outside party "hold" the discussion, for the Sunshine Act's policy that hearings and meetings with the public be open could otherwise be ignored with impunity.[158]
 
 
 82
 Moreover, the intended meaning of the phrase "joint conduct" offers the Commission little comfort. The House Report emphasizes that the phrase "does not exclude the situation where a subdivision authorized to act on behalf of the agency meets with other individuals concerning the conduct or disposition of agency business."[159] Rather, the phrase was intended to exempt solely those situations "where the requisite number of members is physically present in one place but not conducting agency business as a body."[160] Both the House and Senate Reports cite as an example a gathering where one member gives a speech concerning agency business while other members are in the audience.[161] The instant situation is readily distinguishable. The full Committee meets with its foreign counterparts, and the record shows that all members are active participants in the give-and-take.[162]
 
 
 83
 3. "Informal Background Discussions"
 
 
 84
 The Commission relies heavily on a statement in the Senate Report that "[i]t is not the intent of the bill to prevent any two agency members, regardles [sic] of agency size, from engaging in informal background discussions which clarify issues and expose varying views."[163] The Commission contends that the CP meetings are precisely the sort of discussions that Congress intended to exclude by this language. We conclude that this passage from the Senate Report, read in context, does not support the Commission's position.
 
 
 85
 The definition of a "meeting" was recurrently revised during the course of the legislative process.[164] Many members of Congress, both supporters and opponents of the Act, were particularly concerned that the evolving definition might mechanically be extended to informal discussions among members that did not truly constitute the "conduct" of agency business. Examples cited included passing references to agency business at social gatherings,[165] casual background conversations in offices and corridors,[166] banter on the golf course,[167] and breakfast or luncheon discussions among members about the day's business.[168]
 
 
 86
 Although many legislators felt that the phrase "conduct ... of official agency business" by definition excludes such encounters,[169] the language cited by the Commission was inserted into the Senate Report to ensure that discussions of this sort were not construed as actual meetings. The Report emphasizes that the line between these kinds of informal encounters and those amounting to the actual conduct or disposition of agency business is fine, and it reiterates that the Act's presumption of openness requires that all doubts be resolved against closure.[170]
 
 
 87
 The thrust of the language in the Senate Report therefore concerns "informal background discussions" among agency members rather than between members and outsiders.[171] Although we believe that the Sunshine Act does not per se forbid all informal off-the-record discussions between a quorum of an agency and outside parties, we conclude that an agency's burden of persuasion must be especially great in such situations. Congress intended that "hearings" and "meetings with the public" be open; many such gatherings could easily be characterized as "informal background discussions which clarify issues and expose varying views." If we did not apply the narrowest of interpretations to this language, it would readily swallow up the requirement of open "hearings" and "meetings with the public."
 
 
 88
 In the instant case, the Commission has failed to overcome the presumption in favor of openness. The CP discussions are not "chance meetings," "social gatherings," or "informal discussions" among members,[172] but prearranged conferences held to effectuate public business of the greatest import. They focus on concrete issues and are conducted to build a "consensus" that will have far-reaching effects on the structure of the communications industry. They are, in short, an integral part of the Commission's policymaking processes, and as such they constitute the "conduct ... of official agency business."
 
 C. Policy Arguments
 
 89
 The Commission invokes a number of "adverse practical consequences" that would allegedly result from extending the Sunshine Act to the consultative process.[173] These difficulties, the Commission argues, demonstrate that--"at least in the absence of a clear statement by Congress"--the Act should not be interpreted to cover meetings between an agency and its foreign counterparts.[174]
 
 
 90
 The absence of a clear statement by Congress, however, cuts in the other direction.[175] The Sunshine Act's presumption in favor of open meetings is sweeping and, with the exception of enumerated exemptions, unqualified. The Commission points to nothing in the history or structure of the Act to indicate that Congress intended sub silentio to permit the closure of agency meetings simply because foreign representatives are present.
 
 
 91
 Moreover, the Act permits agencies to close meetings that likely would involve the discussion of information exempted from disclosure under 5 U.S.C. Sec. 552b(c) (1976); the district court specifically invited the Commission to take advantage of this provision. For example, section 552b(c)(9) permits an agency to close meetings involving "information the premature disclosure of which would ... be likely to frustrate implementation of a proposed agency action." Similarly, section 552b(c)(1) permits closure where discussions would involve national defense or foreign policy information that is exempt "under criteria established by an Executive order."[176] Thus, Congress fully recognized that certain meetings should not be open to public scrutiny. As we have emphasized, however, "[t]he means Congress chose to accomplish this objective, ... was to permit an agency to close a particular meeting on an individual basis because of the adverse impact public proceedings would be likely to have upon the rights of individuals and the ability of the government to function properly."[177] Rather than acting upon an "individual and particularized basis,"[178] the Commission has sought to exempt an entire category of its business from the requirements of the Sunshine Act. We therefore reject the Commission's restrictive interpretation of "meetings" covered by the Act.[179]
 
 V. THE RULEMAKING DENIAL
 
 92
 We turn finally to the Commission's order denying ITT's petition for rulemaking. Our scope of review is defined by 5 U.S.C. Sec. 706(2) (1976), which requires that we "hold unlawful and set aside agency action, findings, and conclusions found to be," inter alia, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[180]
 
 
 93
 We have noted that the arbitrary and capricious standard is not "a fixed template to be imposed mechanically on every case,"[181] but instead requires calibration in accordance with the nature and context of the challenged action. Where an agency promulgates rules, our standard of review is "diffident and deferential,"[182] but nevertheless requires a "searching and careful" examination of the administrative record to ensure that the agency has fairly considered the issues and arrived at a rational result.[183] Where, as here, an agency chooses not to engage in rulemaking, our level of scrutiny is even more deferential: "It is only in the rarest and most compelling of circumstances that this court has acted to overturn an agency judgment not to institute rulemaking."[184] This added measure of deference, however, is appropriate only where the rejected proposal is addressed to matters within the agency's broad policy discretion.[185] Where a rulemaking petition challenges an agency's compliance with substantive and procedural norms, on the other hand, our standard of review must perforce be "exacting" to ensure that the agency has "scrupulously" followed the law.[186]
 
 
 94
 ITT's rulemaking petition involves both issues of discretion and questions of compliance with statutory and procedural commands. The Commission has considerable discretion, beyond the statutory minima, in fashioning rules for public participation in its processes.[187] Some of ITT's proposals go well beyond minimum statutory requirements, and the Commission might reasonably conclude that they are cumbersome and counterproductive.[188] On the other hand, many of the issues presented in the rulemaking petition call into question the Commission's compliance with the Communications Act, the APA, and the Sunshine Act. Our review of its disposition of these issues must be "thorough, probing, [and] in-depth";[189] the Commission's explanation and the evidence it marshalls "must be such as to enable [us] to determine with some measure of confidence whether or not the [actions are] arbitrary [or] capricious."[190]
 
 
 95
 Applying these standards, we reverse the Commission's rulemaking denial in part, and remand the remaining issues for further consideration in accordance with our discussion below.
 
 A. The Sunshine Act
 
 96
 For the reasons set forth in Part IV, the CP discussions are "meetings" within the meaning of the Sunshine Act, and are therefore governed by the Act's stringent closure provisions. In its rulemaking denial, however, the Commission concluded that these exchanges fall outside of the Sunshine Act's ambit.[191] This determination is not in accordance with law, and we therefore reverse this part of the Commission's order.
 
 B. The Commission's Authority
 
 97
 The Commission's assessment of the scope of its authority deserves deference.[192] 2] Before we can sanction the Commission's course of conduct, however, we must ascertain the nature of its actions, its reasons for the actions, and whether those actions comport with the Communications Act and the APA.[193] The Commission's explanations and the "record" it has assembled are patently inadequate for such a determination.[194] We are asked, in essence, to approve of actions about which we know almost nothing. The record consists simply of the Commission's assertions that it has not negotiated, and of numerous statements by agency members that would appear to undercut these assertions. Self-serving representations are no substitute for an adequate record that would enable us to determine with confidence the actual scope of the Commission's endeavors. By refusing to develop any such record of its contacts with foreign administrations, the Commission has frustrated meaningful judicial review of its rulemaking denial.[195]
 
 
 98
 The Commission argues, however, that no record is required because (1) no one is prejudiced by the informal, off-the-record meetings, and (2) no reviewable "agency action" occurs at the meetings. This argument must be rejected. ITT has pointed to a number of factors that raise serious questions about the Commission's claim that no "agency action" occurs in connection with the consultative process.[196] This court certainly has authority to determine whether activities engaged in by the Commission are subject to judicial review; the circular claim that these activities are unreviewable makes such a determination impossible.
 
 
 99
 In addition to the paucity of the record, several additional "danger signals" suggest that the Commission may not have engaged in "reasoned decision-making" in its rulemaking denial.[197] First, ITT pointed to a number of statements by agency officials that would appear to contradict the Commission's characterization of the CP meetings as mere "information exchanges."[198] In its order, however, the Commission failed completely to acknowledge these statements or to explain the apparent contradictions.[199] Second, the Commission dismissed ITT's ex parte and prejudgment claims as "theoretical" and "speculative, for in the absence of a pending proceeding, be it formal or informal, [such] questions ... simply do not exist."[200] Reference to the Commission's FOIA materials, however, suggests that a number of pending docket proceedings have in fact been discussed at the CP meetings.[201] Finally, there is evidence suggesting that the rulemaking denial was crafted in part to enhance the Commission's litigation posture in the district court action.[202]
 
 
 100
 On the basis of the Commission's statement and the record before us, we therefore cannot sustain the Commission's characterization of its actions, its conclusion that these actions are authorized, or its rejection of all APA safeguards. We must therefore remand the order to the Commission.
 
 
 101
 Our normal course would simply be to instruct the Commission to consider the issues further and develop an adequate record for judicial review.[203] In the instant case, however, we also have a district court action that is simultaneously being remanded for de novo proceedings on the ultra vires issue.[204] To the extent that there is tension in such a "double remand," it is largely of the Commission's own making. As discussed in Part II-A, the issues raised by the ultra vires count are distinct from those presented in the rulemaking denial.[205] District court scrutiny, moreover, is appropriate in large measure because the consultative process has taken place outside of normal administrative channels, thereby necessitating de novo factfinding.[206] At the same time, the necessity for district court intervention does not lessen the degree of scrutiny we apply to the Commission's rulemaking denial,[207] and in no way excuses the Commission's failure to generate a contemporaneous administrative record of the consultative process.[208]
 
 
 102
 Nevertheless, we are concerned that the practical effect of our decision is fraught with the potential for duplication, conflicting resolutions, and further delay. The Commission may avoid these difficulties through the simple expedient of staying further action on ITT's rulemaking petition pending the district court's resolution of the ultra vires issue. If the district court determines that the Commission may not engage in the consultative process, the question of rulemaking will become moot. If the Commission's actions are upheld in part or in whole, the Commission can then consider afresh the extent to which rulemaking may be appropriate, informed by the district court's resolution and guided by the considerations we have set forth today.
 
 
 103
 C. Delegation of Authority to the Telecommunications Committee
 
 
 104
 The Commission may delegate its authority to subdivisions or individual members, but such delegation must be accomplished "by published rule or by order."[209] The Commission has delegated power to the Committee to act upon certain common carrier applications and requests.[210] Its published rule, however, provides no explicit authorization to the Committee to engage in the consultative process.
 
 
 105
 If the Commission argued that the CP exchanges were important to the Committee's discharge of its delegated responsibilities, we might well conclude that no explicit authorization to participate was necessary. Interaction with the public is the "bread-and-butter" of government administration;[211] dialogues with its foreign counterparts might reasonably be characterized as necessary and proper to the efficient transaction of the Committee's business.[212] In the instant case, however, the Commission adamantly maintains that the Committee's functions are strictly limited to its delegated responsibilities, that the CP meetings do not relate to these responsibilities, and that the Committee itself has no authority to act on the Commission's behalf at the meetings.[213] The Commission characterizes the Committee members' attendance as pursuant to their personal capacities: "The authority to meet with foreign entities is not something for which delegation is required since any commissioner, given the nature of his regulatory responsibilities, has the right--indeed, the responsibility--to meet with the public to educate himself regarding the issues."[214]
 
 
 106
 This argument easily fails. The Commission concedes elsewhere that the commissioners attend the meetings in their official capacities and qua the Telecommunications Committee, and the record amply shows that the Committee acts on the Commission's behalf in seeking to effectuate official agency business.[215] Taking the Commission at its word that the Committee's delegated authority does not encompass such endeavors, we direct that, so long as the Committee continues to play this role in the consultative process, it do so only pursuant to a proper and precise delegation of authority from the Commission.
 
 CONCLUSION
 To summarize our decision:
 
 107
 First, with respect to the ultra vires count, we conclude that (a) the district court has subject matter jurisdiction, (b) ITT has standing, and (c) the controversy is ripe for adjudication. We therefore reverse the judgment of the district court dismissing that count and remand for further proceedings.
 
 
 108
 Second, we affirm the district court's judgment ordering disclosure under FOIA of items 1 and 7. We reverse with respect to item 2. As to the other documents contested in this litigation, we reverse and remand to the district court for further consideration and findings.
 
 
 109
 Third, we affirm the district court's judgment that the CP discussions are "meetings" within the meaning of the Sunshine Act. The public may therefore be excluded from these discussions only in accordance with the Act's stringent closure provisions.
 
 
 110
 Finally, we (a) reverse that part of the Commission's rulemaking denial concluding that the Sunshine Act does not encompass the meetings at issue, and (b) remand the remainder of the order to the Commission for further action in accordance with our opinion.
 
 
 111
 So ordered.
 
 
 
 [1]
 As amended, 47 U.S.C. Sec. 151 et seq. (1976 & Supp. IV 1980)
 
 
 [2]
 5 U.S.C. Sec. 552 (1976 & Supp. V 1981)
 
 
 [3]
 Id. Sec. 552b
 
 
 [4]
 Id. Sec. 551 et seq
 
 
 [5]
 See infra notes 16-26 and accompanying text
 
 
 [6]
 See ITT World Communications, Inc. v. FCC, Civ. No. 80-0428 (D.D.C. Oct. 17, 1980) [hereinafter cited without cross-reference as "District Court Opinion"], reprinted in Joint Appendix ("JA") at 148-55
 
 
 [7]
 See Petition of ITT World Communications, Inc., 77 F.C.C.2d 877 (1980) [hereinafter cited as "Rulemaking Denial"]
 On January 2, 1981, this court denied ITT's motion to consolidate these appeals, but directed that they be presented on the same day before the same panel.
 
 
 [8]
 Record service is the telecommunication of information in written or graphic form, and includes telegram, telex, and teletypewriter exchange services. The Commission is taking steps to eliminate the regulatory distinction between record and voice communications. See Western Union Int'l, Inc. v. FCC, 673 F.2d 539, 541 & n. 4 (D.C.Cir.1982)
 
 
 [9]
 For background, see Preliminary Audit and Study of Operations of Int'l Carriers, 75 F.C.C.2d 726 (1980); H.R.REP. NO. 356, 97th Cong., 1st Sess. 5, 25-32, U.S.Code Cong. & Admin.News 1981, p. 2730 (1981)
 
 
 [10]
 The other major IRCs are Western Union International, Inc., RCA Global Communications, Inc., and TRT Communications Corporation. Together these four carriers have a 98.5% share of American traffic in the international record communications market. H.R.REP. NO. 356, 97th Cong., 1st Sess. 31 (1981) (chart 14) (1980 figures). RCA has intervened in No. 80-1721 in support of ITT's rulemaking petition
 
 
 [11]
 The Commission's international competition policies parallel its efforts with respect to domestic record service. See generally Western Union Tel. Co. v. FCC, 665 F.2d 1126 (D.C.Cir.1981); Western Union Tel. Co. v. FCC, 665 F.2d 1112 (D.C.Cir.1981)
 
 
 [12]
 Graphnet Syss., Inc., 63 F.C.C.2d 402 (1977), aff'd in part and remanded in part sub nom. ITT World Communications, Inc. v. FCC, 595 F.2d 897 (2d Cir.1979). Departing from its usual practice, the Commission granted these authorizations even though Telenet and Graphnet had not yet obtained the necessary interconnection agreements to commence international service. This prompted the Second Circuit to remand for the Commission to make the two carriers' authorizations contingent on their obtaining operating agreements within a reasonable time. 595 F.2d at 902-03
 
 
 [13]
 United States carriers technically own and control the overseas circuits only to a fictional midpoint, where fictional "handoffs" to correspondent foreign carriers occur. The participating carriers divide revenues according to negotiated agreements. See RCA Communications, Inc. v. United States, 43 F.Supp. 851, 853 (S.D.N.Y.1942)
 
 
 [14]
 See Brief for Respondents in No. 80-1721, at 7 [hereinafter cited without cross-reference as "FCC Brief"]. Telecommunications services in most countries are provided by government agencies known as "administrations"; these agencies are also referred to as "PTTs" (Postal, Telephone, and Telegraph authorities)
 
 
 [15]
 See generally Rulemaking Denial, supra note 7, 77 F.C.C.2d at 885; H.R.REP. NO. 356, 97th Cong., 1st Sess. 10-13, 35-36, 39-40 (1981). See also 1 Martech Strategies, Inc., Competition and Deregulation in International Telecommunications 12 (July 10, 1981) (contracted report for National Telecommunications and Information Administration), quoted in H.R.REP. NO. 356, supra, at 36:
 ... The PTTs overwhelmingly prefer the status quoo [sic] to the changes proposed by the Commission. In essence, they perceive the proposed changes as challenging their monopoly position and control over telecommunications usage and pricing of services. European PTTs appear relatively satisfied with the existing international telecommunications industry structure .... The PTTs also claimed that the decisions would not substantially result in improved services to their customers.
 The intense oposition [sic] on the part of foreign PTTs to the FCC's restructuring proposals established a formidable barrier to entry, if not a block, in the near term.
 In an effort to circumvent this unwillingness, Congress recently enacted the Record Carrier Competition Act of 1981, Pub.L. No. 97-130, 95 Stat. 1687 (to be codified at 47 U.S.C. Sec. 222). That Act directs American record carriers with overseas interconnections to make their circuits available to carriers without interconnections "upon terms and conditions which are just, fair, and reasonable." 47 U.S.C.A. Sec. 222(c)(1)(A)(i) (West Supp.1982). If a foreign administration refuses to assign American-bound record traffic to a carrier without an interconnection agreement, the assigned carrier must pass along to the unassigned carrier a share of traffic proportionate to the level of foreign-bound traffic generated by the unassigned carrier. Id. Sec. 222(c)(1)(A)(ii)(I). Although not affecting the operational practices of the interconnecting foreign carriers, this arrangement therefore has the effect of promoting competition among American record carriers and "reduc[ing] the ability of monopoly foreign administrations to impede competition." H.R.REP. NO. 356, supra, at 12-13, U.S.Code Cong. & Admin.News 1981, pp. 2738-39.
 
 
 [16]
 For background on the CP, see AT&T Co. (TAT-7), 73 F.C.C.2d 248, 254-55 (1979); Policies for Overseas Common Carriers, 73 F.C.C.2d 193 (1979). The technical exchanges are intended to "lead to the formulation of ... traffic forecasts, data bases and analytical methodologies for assessing the service reliability and economical aspects of facilities alternatives." Policies, supra, 73 F.C.C.2d at 195
 
 
 [17]
 FCC Brief at 9
 
 
 [18]
 Rulemaking Denial, supra note 7, 77 F.C.C.2d at 884 n. 4
 
 
 [19]
 Id. at 883, 885; see also FCC Brief at 20, 24, 30; Brief for FCC in Nos. 80-2324 & 80-2401, at 3, 20, 23 & n. 11 (filed on behalf of the FCC by the Department of Justice) [hereinafter cited without cross-reference as "DOJ Brief"]; Affidavit of Comm'r Robert E. Lee (Oct. 23, 1980) [hereinafter cited without cross-reference as "Lee Affidavit"], reprinted in JA at 587-89
 
 
 [20]
 Rulemaking Denial, supra note 7, 77 F.C.C.2d at 885
 
 
 [21]
 Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment, at 24 (emphasis added) [hereinafter cited without cross-reference as "FCC District Court Memorandum"], reprinted in JA at 514. See also FCC Brief at 31-32 n. 26; DOJ Brief at 21-24; Lee Affidavit p 2, reprinted in JA at 587
 
 
 [22]
 See DOJ Brief at 24
 
 
 [23]
 See Rulemaking Denial, supra note 7, 77 F.C.C.2d at 883, 884-85. See also infra notes 37-39 and accompanying text
 
 
 [24]
 Telex from Robert R. Bruce, General Counsel, FCC, to Robert Seguin, Vice-President, Teleglobe Canada, at 3-4, 9-10 (Mar. 19, 1979), reprinted in JA at 218-19, 224-25. See also infra note 26 and accompanying text
 
 
 [25]
 FCC Brief at 24; see also id. at 4; Affidavit of Willard L. Demory, p 8 (Feb. 13, 1981) ("The Europeans appreciate the opportunity to communicate with us directly and prefer this to [discussions] through diplomatic channels.") [hereinafter cited without cross-reference as "Demory Affidavit"], reprinted in DOJ Brief at 4a
 
 
 [26]
 For example, Commission Chairman Charles Ferris asserted in 1979 that the Committee seeks to apply "leverage" at the meetings to "bring a greater sense of urgency to our correspondents overseas so that they will give due consideration to the competitive environment ... [we] have in the United States." Hearings before the Subcomm. on Communications of the Senate Comm. on Commerce, Science, and Transp., 96th Cong., 1st Sess. 1578, 1586 (1979) (remarks of Chairman Charles D. Ferris). Referring to Commission authorizations of transatlantic communications cables (TATs), another commissioner has stated that the FCC expects a " 'tit' for the 'tat' " and a "quid pro quo." Transcript of Montreal CP Meeting, at 108-09 (Mar. 22, 1979) (remarks of Comm'r Joseph R. Fogarty), reprinted in JA at 229-30. Similarly, another commissioner has said that the Committee is "talking to people in a negotiating stance abroad." Transcript of FCC Open Meeting, at 2 (Apr. 22, 1980) (remarks of Comm'r Abbott Washburn), reprinted in JA at 415. See also id. at 5 (remarks of Comm'r Robert E. Lee), reprinted in JA at 418; Transcript of FCC Open Meeting, at 9-10 (Feb. 8, 1980) (remarks of Comm'r Fogarty), reprinted in JA at 409-10
 
 
 [27]
 Petition for Rulemaking Concerning Contacts Between the F.C.C. and Foreign Telecommunications Administrations, RM 3523, at 2 (filed Oct. 24, 1979) [hereinafter cited without cross-reference as "Rulemaking Petition"], reprinted in JA at 16-40
 
 
 [28]
 Id. at 22-23, reprinted in JA at 37-38
 
 
 [29]
 Id. at 23, reprinted in JA at 38
 
 
 [30]
 Specifically, the petition asked the Commission to (a) provide at least 30 days' notice in advance of any meeting with representatives of foreign administrations or telecommunications entities of the time, place, and subject matter of the proposed discussions; (b) provide all interested parties the opportunity to comment on the "propriety or wisdom" of the proposed agenda and to propose additional subjects for discussion; and (c) issue another public notice responding to all comments received. See id. at 23-24, reprinted in JA at 38-39
 
 
 [31]
 Comments were filed by RCA Global Communications, Satellite Business Systems, Southern Pacific Communications Company, Telenet, and Graphnet; reply comments were filed by ITT, RCA, and Western Union International. See JA at 44-131
 
 
 [32]
 Rulemaking Denial, supra note 7, 77 F.C.C.2d at 882 (emphasis in original)
 
 
 [33]
 Id. at 885
 
 
 [34]
 Id. at 883
 
 
 [35]
 Id
 
 
 [36]
 Id. at 884
 
 
 [37]
 Id. at 882; see also id. at 884
 
 
 [38]
 Id. at 884-85 & n. 6. The Commission cited sections 1, 214, 301, 303(n), and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. Secs. 151, 214, 301, 303(n), 303(r) (1976). It also invoked section 201(c) of the Communications Satellite Act of 1962, 47 U.S.C. Sec. 721(c) (1976)
 
 
 [39]
 Rulemaking Denial, supra note 7, 77 F.C.C.2d at 885
 
 
 [40]
 5 U.S.C. Sec. 552b(a)(2) (1976)
 
 
 [41]
 See infra note 145 and accompanying text
 
 
 [42]
 Rulemaking Denial, supra note 7, 77 F.C.C.2d at 887
 
 
 [43]
 Id
 
 
 [44]
 Id. at 888
 
 
 [45]
 Id
 
 
 [46]
 Complaint, ITT World Communications, Inc. v. FCC, Civ. No. 80-0428 (D.D.C.) (filed Feb. 12, 1980) [hereinafter cited without cross-reference as "Complaint"], reprinted in JA at 196-208
 
 
 [47]
 Id. p 22, reprinted in JA at 204
 
 
 [48]
 District Court Opinion at 4, reprinted in JA at 151
 
 
 [49]
 FCC District Court Memorandum at 3, reprinted in JA at 493; see also DOJ Brief at 14-15
 
 
 [50]
 See, e.g., Whitney Nat'l Bank v. Bank of New Orleans & Trust Co., 379 U.S. 411, 422, 85 S.Ct. 551, 558, 13 L.Ed.2d 386 (1965); City of Rochester v. Bond, 603 F.2d 927, 931 (D.C.Cir.1979); Independent Cosmetic Mfrs. & Distributors, Inc. v. United States Dep't of HEW, 574 F.2d 553, 555 & n. 2 (D.C.Cir.), cert. denied, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978); Nader v. Volpe, 466 F.2d 261, 266-68 (D.C.Cir.1972). See also 5 U.S.C. Sec. 703 (1976)
 
 
 [51]
 DOJ Brief at 15
 
 
 [52]
 See, e.g., Amusement & Music Operators Ass'n v. Copyright Royalty Tribunal, 636 F.2d 531, 533-34 (D.C.Cir.1980) ("[A]gency action is aptly examined in the District Court when the court proceeding is to be de novo and based on a new record compiled in the court itself. Where review is to be on the agency record, the Court of Appeals is well suited to consider the challenge in the first instance.") (emphasis in original) (footnote omitted), cert. denied, 450 U.S. 912, 101 S.Ct. 1352, 67 L.Ed.2d 336 (1981); Investment Co. Inst. v. Board of Governors of Fed. Reserve Sys., 551 F.2d 1270, 1278 (D.C.Cir.1977) (order reviewable in court of appeals "is interpreted to mean any agency action capable of review on the basis of the administrative record"); Deutsche Lufthansa Aktiengesellschaft v. CAB, 479 F.2d 912, 916 (D.C.Cir.1973) ("It is the availability of a record for review ... which is now the jurisdictional touchstone."); Independent Broker-Dealers' Trade Ass'n v. SEC, 442 F.2d 132, 143 (D.C.Cir.), cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971)
 
 
 [53]
 For more on the Commission's rulemaking record, see infra notes 194-202 and accompanying text
 
 
 [54]
 As discussed infra Part V-B, we cannot affirm the Commission's order denying ITT's rulemaking petition on the basis of the record before us. There is some tension between our remand of that order for further consideration and our remand of the ultra vires count for district court factfinding; the practical effect of our decision is that both the district court and the Commission will consider the nature of the Committee's off-the-record activities. We discuss coordination of this "double remand" infra p. 1248
 
 
 [55]
 FCC Brief at 24 (emphasis added)
 
 
 [56]
 See, e.g., Association of Nat'l Advertisers, Inc. v. FTC, 617 F.2d 611, 619-22 (D.C.Cir.1979); id. at 626 (Wright, C.J., concurring in the result); see also 5 U.S.C. Sec. 704 (1976). This preference for statutory remedies reflects important policies, including deference to administrative expertise, respect for administrative autonomy, and avoidance of piecemeal review. See, e.g., City of Rochester v. Bond, supra note 50, 603 F.2d at 936; Nader v. Volpe, supra note 50, 466 F.2d at 267-68. It also embodies aspects of ripeness, exhaustion, and finality doctrines. See, e.g., Association of Nat'l Advertisers, Inc. v. FTC, supra, 617 F.2d at 620-21; Nader v. Volpe, supra note 50, 466 F.2d at 268; cf. Gulf Oil Corp. v. United States Dep't of Energy, 663 F.2d 296, 307-13 (D.C.Cir.1981)
 
 
 [57]
 Association of Nat'l Advertisers, Inc. v. FTC, supra note 56, 617 F.2d at 621 (footnote omitted)
 
 
 [58]
 Nader v. Volpe, supra note 50, 466 F.2d at 266, 269
 
 
 [59]
 The Commission argues that district court jurisdiction is appropriate only where there is a demonstrated, "patent" violation of agency authority, and that "[w]hatever this Court's ultimate view of the scope of the FCC's authority ... it surely is not acting in violation of any clear statutory prohibition or committing any patent violation of its authority." DOJ Brief at 16 (emphasis added). The "patent violation" doctrine is well established, see, e.g., Leedom v. Kyne, 358 U.S. 184, 188-91, 79 S.Ct. 180, 183-85, 3 L.Ed.2d 210 (1958); Independent Cosmetic Mfrs. & Distributors, Inc. v. United States Dep't of HEW, supra note 50, 574 F.2d at 555, but it is inapposite to the instant controversy. Contrary to the Commission's suggestions, the doctrine is not designed to restrict general federal question jurisdiction over agency actions to a small category of egregious cases, or to subject plaintiffs to a high burden in alleging a prima facie case of agency misconduct. Rather, the doctrine is properly invoked only where district court jurisdiction would otherwise be entirely concurrent with that of the courts of appeals--that is, where reliance on statutory review would provide thorough examination of the issues and ensure adequate relief on appeal. This is not a case of true concurrency, however, because (1) de novo factfinding is necessary, and (2) subsequent statutory review would accord ineffectual relief
 
 
 [60]
 5 U.S.C. Sec. 702 (1976)
 
 
 [61]
 The Logan Act, 18 U.S.C. Sec. 953 (1976), prohibits unauthorized "correspondence or intercourse" by United States citizens
 with any foreign government or any officer or agent thereof, with intent to influence the measures or conduct of any foreign government or of any officer or agent thereof, in relation to any disputes or controversies with the United States, or to defeat the measures of the United States.
 
 
 [62]
 Complaint p 22, reprinted in JA at 204 (emphasis added)
 
 
 [63]
 Id. paragraphs 10, 21, reprinted in JA at 199, 203-04
 
 
 [64]
 On the rules governing standing, see generally Bryant v. Yellen, 447 U.S. 352, 366-68, 100 S.Ct. 2232, 2240-41, 65 L.Ed.2d 184 (1980); Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 37-46, 96 S.Ct. 1917, 1923-28, 48 L.Ed.2d 450 (1976); Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 151-55, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970); Control Data Corp. v. Baldridge, 655 F.2d 283, 288-89 (D.C.Cir.), cert. denied, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981)
 
 
 [65]
 As we assume in reviewing the district court's dismissal. See, e.g., Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)
 
 
 [66]
 See, e.g., Writers Guild of America, West, Inc. v. American Broadcasting Co., Inc., 609 F.2d 355, 365 (9th Cir.1979) ("Regulation through 'raised eyebrow' techniques or through forceful jawboning is commonplace in the administrative context, and in some instances may fairly be characterized ... as official action by the agency.") (footnotes omitted), cert. denied, 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980); Hercules, Inc. v. FPC, 552 F.2d 74, 77-78 (3d Cir.1977) ("jawboning strategy"); Independent Broker-Dealers' Trade Ass'n v. SEC, supra note 52, 442 F.2d at 137-43 (informal pressure tactics); Moss v. CAB, 430 F.2d 891, 897-900 (D.C.Cir.1970) (same). Compare Illinois Citizens Comm. for Broadcasting v. FCC, 515 F.2d 397, 402 (D.C.Cir.1974) (individual commissioner's speech representing unofficial views not "agency action"). Cf. Consolidated Edison Co. of New York, Inc. v. FPC, 512 F.2d 1332, 1341-43 (D.C.Cir.), clarified, 518 F.2d 448 (D.C.Cir.1975)
 
 
 [67]
 It might be argued, although the Commission has not done so, that the presence of foreign administrations in the causal chain makes ITT's threatened injuries too speculative. It is not inconceivable that, independent of the Commission's efforts, the foreign administrations will enter into operating agreements with the new American carriers. The record shows that European opposition to the new competition is intense, however, and ITT's complaint is that the Commission's "negotiations" and "leverage" are likely to override this intransigence. The Commission itself acknowledges the causal nexus, conceding that its behind-the-scenes actions are designed to effectuate operating agreements for the new carriers. See supra notes 24-25 and accompanying text. ITT's allegations have therefore established a sufficient likelihood that the relief it requests will benefit it in a tangible, perceptible way. Compare Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); United States v. SCRAP, 412 U.S. 669, 688-90, 93 S.Ct. 2405, 2416-17, 37 L.Ed.2d 254 (1973); Natural Resources Defense Council, Inc. v. SEC, 606 F.2d 1031, 1042-43 & n. 11 (D.C.Cir.1979) with Warth v. Seldin, supra note 65, 422 U.S. at 505, 95 S.Ct. at 2208; Winpisinger v. Watson, 628 F.2d 133, 138-39 (D.C.Cir.1980)
 
 
 [68]
 See, e.g., Association of Data Processing Serv. Orgs., Inc. v. Camp, supra note 64, 397 U.S. at 153, 90 S.Ct. at 829; Columbia Broadcasting Sys., Inc. v. United States, 316 U.S. 407, 422-23, 62 S.Ct. 1194, 1202-03, 86 L.Ed. 1563 (1942); FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 476-77, 60 S.Ct. 693, 698, 84 L.Ed. 869 (1940)
 Our standing test also requires that there be no "clear and convincing" indication of congressional intent to withhold judicial review. Control Data Corp. v. Baldridge, supra note 64, 655 F.2d at 288-89. There is no such indication in this case.
 
 
 [69]
 We express no views on the scope of the Commission's authority to meet with foreign administrations. Nor do we consider whether the Commission's efforts on behalf of Graphnet and Telenet constitute arbitrary action with respect to other regulated carriers. Cf. Teamsters Local Union 769 v. NLRB, 532 F.2d 1385, 1392 (D.C.Cir.1976). Finally, we do not consider whether alleged attempts to "leverage" foreign administrations through facilities authorization decisions, see supra note 26 and accompanying text, would violate the "public convenience or necessity" standard of 47 U.S.C. Sec. 214(a) (1976)
 
 
 [70]
 District Court Opinion at 4-5 (citation omitted), reprinted in JA at 151-52
 
 
 [71]
 Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). On ripeness doctrine, see generally FTC v. Standard Oil Co., 449 U.S. 232, 239-43, 101 S.Ct. 488, 493-95, 66 L.Ed.2d 416 (1980); Gulf Oil Corp. v. United States Dep't of Energy, supra note 56, 663 F.2d at 309-13
 
 
 [72]
 This inadequacy is also a touchstone of our subject matter jurisdiction analysis. See supra notes 55-58 and accompanying text
 
 
 [73]
 The district court did not address the Commission's assertion that ITT failed to exhaust its administrative remedies, nor has the Commission pressed this argument on appeal
 
 
 [74]
 Letter from Grant S. Lewis to Executive Director, FCC, at 1 (Oct. 12, 1979), reprinted in JA at 159
 
 
 [75]
 Letter from Philip L. Verveer, Chief, Common Carrier Bureau, to Grant S. Lewis (Nov. 16, 1979), reprinted in JA at 161-69. Most of the items released were copies of letters and telexes between Commission officials and representatives of foreign administrations. Also released were five pages of a transcript of a CP meeting held in Montreal, Canada, in March 1979, and correspondence between ITT and the Commission. See id., Attachment I, reprinted in JA at 167
 
 
 [76]
 ITT filed an Application for Review on December 17, 1979. See JA at 170-83. Because the Commission failed to respond to this appeal within 20 working days, see 5 U.S.C. Sec. 552(a)(6)(A)(ii) (1976), ITT was deemed to have exhausted its administrative remedies, see id. Sec. 552(a)(6)(C). Shortly after ITT filed its complaint, the Commission acted on the appeal, refusing to disclose anything further except for factual portions of three documents. ITT World Communications, Inc. On Request for Inspection of Records, 76 F.C.C.2d 453 (1980) [hereinafter cited as "Records Denial"]
 
 
 [77]
 The Commission argued in the district court that the attorney-client privilege, as embodied in Exemption 5, also precluded disclosure. The district court rejected that assertion, stating that the "privilege only attaches when an attorney is performing a service that only an attorney can perform, and the communications between attorney and client are made in confidence. Neither showing has been made here." District Court Opinion at 5 n. 2, reprinted in JA at 152. The Commission has not advanced its claim of attorney-client privilege on appeal
 
 
 [78]
 5 U.S.C. Sec. 552(a)(4)(B) (1976)
 
 
 [79]
 See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 459-61; Affidavit of H. Russell Frisby, Jr. (Apr. 15, 1980) [hereinafter cited without cross-reference as "Frisby Affidavit"], reprinted in JA at 340-41; Affidavit of Robert E. Gosse (June 2, 1980) [hereinafter cited without cross-reference as "Gosse Affidavit"], reprinted in JA at 343-46; Affidavit of James E. Graf II (June 2, 1980) [hereinafter cited without cross-reference as "Graf Affidavit"], reprinted in JA at 348-54; Affidavit of Sebastian A. Lasher (June 2, 1980) [hereinafter cited without cross-reference as "Lasher Affidavit"], reprinted in JA at 356-58; Affidavit of Elliot Maxwell (June 3, 1980) [hereinafter cited without cross-reference as "Maxwell Affidavit"], reprinted in JA at 365-67; FCC District Court Memorandum at 10-21, reprinted in JA at 500-11
 
 
 [80]
 After reconsideration, the Commission released item 6. Records Denial, supra note 76, 76 F.C.C.2d at 457 n. 10
 
 
 [81]
 Items 4, 9, 11, 12, 13, 14, and 15. See infra notes 88-94 and accompanying text
 
 
 [82]
 Items 2, 3, 5, 7, 8, and 10. See infra notes 107-08 and accompanying text
 
 
 [83]
 Item 1. See infra note 122 and accompanying text
 
 
 [84]
 District Court Opinion at 6, reprinted in JA at 153 (emphasis added) (citations omitted)
 
 
 [85]
 Founding Church of Scientology of Washington, D.C., Inc. v. Bell, 603 F.2d 945, 950 (D.C.Cir.1979) (footnote omitted); see also Marks v. CIA, 590 F.2d 997, 1010-11 (D.C.Cir.1978) (Wright, C.J., concurring); Schwartz v. IRS, 511 F.2d 1303, 1306-07 (D.C.Cir.1975)
 
 
 [86]
 We reverse outright, however, with respect to item 2. See infra note 116 and accompanying text
 
 
 [87]
 The exception is item 15, a memorandum from Commissioner Fogarty to Chairman Ferris. See infra note 94 and accompanying text. The analysis presented in the text, however, applies with full force to this document. See infra notes 96-101 and accompanying text
 
 
 [88]
 Memorandum from Joel S. Winnik, staff attorney, to Walter R. Hinchman, Chief, Common Carrier Bureau (Aug. 25, 1976). See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 460; Gosse Affidavit p F, reprinted in JA at 345-46
 
 
 [89]
 Memorandum from Sebastian A. Lasher, engineering assistant, to Comm'r Abbott Washburn (Apr. 26, 1979). See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 460; Lasher Affidavit paragraphs 3-5, reprinted in JA at 356-58. The recent decision in question was ITT World Communications, Inc. v. FCC, 595 F.2d 897 (2d Cir.1979). See supra note 12
 
 
 [90]
 Memorandum from Lawrence Katz, attorney-advisor, to Comm'r Joseph Fogarty (undated). See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 461; Graf Affidavit p 7, reprinted in JA at 351
 
 
 [91]
 Memorandum from Lawrence Katz, attorney-advisor, to Comm'r Joseph Fogarty (undated). See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 461; Graf Affidavit p 8, reprinted in JA at 352
 
 
 [92]
 Memorandum from Lawrence Katz, attorney-advisor, to Comm'r Joseph Fogarty (undated). See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 461; Graf Affidavit p 9, reprinted in JA at 352-53
 
 
 [93]
 Memorandum from Lawrence Katz, attorney-advisor, to Comm'r Joseph Fogarty (undated). See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 461; Graf Affidavit p 10, reprinted in JA at 353
 
 
 [94]
 Memorandum from Comm'r Joseph Fogarty to Chairman Charles Ferris (Oct. 5, 1978). See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 461; Graf Affidavit p 11, reprinted in JA at 353
 
 
 [95]
 District Court Opinion at 6, reprinted in JA at 153
 
 
 [96]
 See generally Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 183-90, 95 S.Ct. 1491, 1499-03, 44 L.Ed.2d 57 (1975); NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150-54, 159-60, 95 S.Ct. 1504, 1516-18, 1520-21, 44 L.Ed.2d 49 (1975); Taxation With Representation Fund v. IRS, 646 F.2d 666, 676-81 (D.C.Cir.1981); Brinton v. Department of State, 636 F.2d 600, 604-06 (D.C.Cir.1980), cert. denied, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981); Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 866-69 (D.C.Cir.1980); Jordan v. United States Dep't of Justice, 591 F.2d 753, 772-74 (D.C.Cir.1978) (en banc); Vaughn v. Rosen, 523 F.2d 1136, 1143-44 (D.C.Cir.1975); S.REP. NO. 813, 89th Cong., 1st Sess. 9 (1965)
 
 
 [97]
 Coastal States Gas Corp. v. Department of Energy, supra note 96, 617 F.2d at 866; see also Arthur Andersen & Co. v. IRS, 679 F.2d 254, 257-58 (D.C.Cir.1982)
 
 
 [98]
 Coastal States Gas Corp. v. Department of Energy, supra note 96, 617 F.2d at 869
 
 
 [99]
 Sterling Drug Inc. v. FTC, 450 F.2d 698, 708 (D.C.Cir.1971); see also Taxation With Representation Fund v. IRS, supra note 96, 646 F.2d at 678-79
 
 
 [100]
 Coastal States Gas Corp. v. Department of Energy, supra note 96, 617 F.2d at 867, 869; see also Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., supra note 96, 421 U.S. at 185-86, 95 S.Ct. at 1500-01; Taxation With Representation Fund v. IRS, supra note 96, 646 F.2d at 679; Ryan v. Department of Justice, 617 F.2d 781, 790-91 (D.C.Cir.1980)
 
 
 [101]
 See, e.g., NLRB v. Sears, Roebuck & Co., supra note 96, 421 U.S. at 161, 95 S.Ct. at 1521; Brinton v. Department of State, supra note 96, 636 F.2d at 605
 
 
 [102]
 See, e.g., Founding Church of Scientology of Washington, D.C., Inc. v. Bell, supra note 85, 603 F.2d at 952-53; Marks v. CIA, supra note 85, 590 F.2d at 1003; Mead Data Central, Inc. v. United States Dep't of Air Force, 566 F.2d 242, 262-63 (D.C.Cir.1977)
 
 
 [103]
 EPA v. Mink, 410 U.S. 73, 91, 93 S.Ct. 827, 837, 35 L.Ed.2d 119 (1973). See infra notes 124, 126-31, and accompanying text
 
 
 [104]
 See cases cited supra note 100
 
 
 [105]
 NLRB v. Sears, Roebuck & Co., supra note 96, 421 U.S. at 153, 95 S.Ct. at 1517 (quoting Davis, The Information Act: A Preliminary Analysis, 34 U.CHI.L.REV. 761, 797 (1967))
 
 
 [106]
 5 U.S.C. Sec. 552(a)(4)(B) (1976)
 
 
 [107]
 Item 2 consists of 6 drafts of a telex from Chairman Ferris to Torsten Larsson, Chairman of CEPT/CLTA, Central Administration of Swedish Telecommunications (Oct. 31, 1979). Item 3 is a draft of a telex from Chairman Ferris to Jean-Claude DeLorme, President, Teleglobe Canada (Oct. 31, 1979). See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 459-60; Gosse Affidavit p E, reprinted in JA at 345. Copies of the final telexes were released. See Records Denial, supra note 76, Attachment I, 76 F.C.C.2d at 459; see also JA at 233-35 (reprint of telex to Chairman Larsson)
 
 
 [108]
 See Gosse Affidavit p G, Graf Affidavit p 6, Maxwell Affidavit p 10, reprinted in JA at 346, 351, 367
 Item 5 is a 1-page section of a 28-page memorandum from Robert Gosse and James Warwick, staff attorneys, to FCC attendees of the Dublin Conference (Sept. 1979). The memorandum is entitled "Expansion of Areas of Consultative Contact," and the withheld section consists of recommendations, opinions, and options. See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 460; Gosse Affidavit p G, reprinted in JA at 346.
 Item 7 is a memorandum from Russell Frisby, attorney-advisor, to James Smith, for FCC attendees of the Dublin Conference (undated). See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 460; Frisby Affidavit, reprinted in JA at 340-41.
 Item 8 is an undated memorandum prepared by Elliot Maxwell, assistant to Chairman Ferris, for Ferris's use at the Dublin Conference. It consists of proposed remarks that were not delivered, proposals for expanding the consultative process, and proposed responses to possible foreign arguments. See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 460; Maxwell Affidavit paragraphs 3-11, reprinted in JA at 365-67.
 Item 10 is a memorandum from Angela Shaw, attorney-advisor, to Comm'r Joseph Fogarty (Dec. 16, 1976). Four of the 6 pages were released. The remainder consists of "recommendations regarding the issues to be discussed" at a CP meeting. Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 460; Graf Affidavit p 6, reprinted in JA at 351.
 
 
 [109]
 The closed Dublin meeting, for example, was largely devoted to the Commission's proposal to expand the focus of the consultative process. See FCC Brief at 9; Maxwell Affidavit paragraphs 5, 8-10, reprinted in JA at 366-67
 
 
 [110]
 See supra notes 19-20 and accompanying text
 
 
 [111]
 See infra notes 122-37 and accompanying text
 
 
 [112]
 See supra notes 96-101 and accompanying text
 
 
 [113]
 Mead Data Central, Inc. v. United States Dep't of Air Force, supra note 102, 566 F.2d at 257
 
 
 [114]
 Coastal States Gas Corp. v. Department of Energy, supra note 96, 617 F.2d at 866
 
 
 [115]
 Id. (citation omitted); see also Jordan v. United States Dep't of Justice, supra note 96, 591 F.2d at 772-74
 
 
 [116]
 See Telex from Charles Ferris, Chairman, FCC, to Torsten Larsson, Chairman, CEPT/CLTA, Central Administration of Swedish Telecommunications (Oct. 31, 1979), reprinted in JA at 233-35. See also supra note 107
 
 
 [117]
 See, e.g., Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., supra note 96, 421 U.S. at 184-85, 192, 95 S.Ct. at 1500, 1504; NLRB v. Sears, Roebuck & Co., supra note 96, 421 U.S. at 151-52, 159-60, 95 S.Ct. at 1516-17, 1520-21; Vaughn v. Rosen, supra note 96, 523 F.2d at 1147 n. 38
 
 
 [118]
 For a description of this document, see supra note 108
 
 
 [119]
 Frisby Affidavit p 3, reprinted in JA at 340-41
 
 
 [120]
 See infra notes 122-34 and accompanying text
 
 
 [121]
 See, e.g., Coastal States Gas Corp. v. Department of Energy, supra note 96, 617 F.2d at 854, 863-64, 865-66, 870
 
 
 [122]
 The notes were taken and compiled by two staff attorneys, Robert Gosse and James Warwick. See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 459-60; Gosse Affidavit p D, reprinted in JA at 345
 
 
 [123]
 See, e.g., County of Madison v. United States Dep't of Justice, 641 F.2d 1036, 1039-41 (1st Cir.1981); Mead Data Central, Inc. v. United States Dep't of Air Force, supra note 102, 566 F.2d at 257-58; Washington Research Project, Inc. v. Department of HEW, 504 F.2d 238, 244-45 (D.C.Cir.1974), cert. denied, 421 U.S. 963, 95 S.Ct. 951, 44 L.Ed.2d 450 (1975). For exceptions, see, e.g., Forsham v. Harris, 445 U.S. 169, 182-86, 100 S.Ct. 978, 985-87, 63 L.Ed.2d 293 (1980); Ryan v. Department of Justice, 617 F.2d 781, 789-91 (D.C.1980); and Soucie v. David, 448 F.2d 1067, 1078 n. 44 (D.C.Cir.1971), all dealing with advisory material solicited from outside consultants as part of the deliberative process
 
 
 [124]
 See EPA v. Mink, supra note 103, 410 U.S. at 89-91, 93 S.Ct. at 836-37; Brinton v. Department of State, supra note 96, 636 F.2d at 604-06. For exceptions, see infra notes 130-31 and accompanying text
 
 
 [125]
 Material pertaining to foreign and defense affairs may be withheld if properly classified pursuant to executive order. See 5 U.S.C. Sec. 552(b)(1) (1976). This exemption is not at issue in the instant litigation
 
 
 [126]
 DOJ Brief at 32
 
 
 [127]
 677 F.2d 931 (D.C.Cir.1982)
 
 
 [128]
 Id. at 935
 
 
 [129]
 Id
 
 
 [130]
 See, e.g., Lead Indus. Ass'n, Inc. v. OSHA, 610 F.2d 70 (2d Cir.1979) (summaries of evidence in rulemaking proceedings); Montrose Chem. Corp. v. Train, 491 F.2d 63 (D.C.Cir.1974) (summaries of evidence in adjudicatory proceedings)
 
 
 [131]
 Montrose Chem. Corp. v. Train, supra note 130, 491 F.2d at 68 ("Whether he weighed the correct factors, whether his judgmental scales were finely adjusted and delicately operated, disappointed litigants may not probe his deliberative process.") (footnote omitted); see also Lead Indus. Ass'n, Inc. v. OSHA, supra note 130, 610 F.2d at 83-84
 
 
 [132]
 DOJ Brief at 33 (quoting Gosse Affidavit p D, reprinted in JA at 345)
 
 
 [133]
 Vaughn v. Rosen, supra note 96, 523 F.2d at 1145-46
 
 
 [134]
 The Commission's reliance on Brinton v. Department of State, supra note 96, 636 F.2d 600, is misplaced. The court in that case exempted the disputed memoranda from disclosure even though they did not relate to a specific decision, but the material therein was analytical and recommendatory, not factual
 
 
 [135]
 DOJ Brief at 32
 
 
 [136]
 For its previous application, see, e.g., Merrill v. Federal Open Mkt. Comm., 565 F.2d 778, 786 (D.C.Cir.1977), vacated on other grounds, 443 U.S. 340, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979); Brockway v. Department of Air Force, 518 F.2d 1184, 1193 (8th Cir.1975)
 
 
 [137]
 The Commission simply asserts in a conclusory manner that "[t]he prospect of disclosure would, in our view, tend to discourage these candid exchanges ...." Records Denial, supra note 76, 76 F.C.C.2d at 458. See also infra note 179 and accompanying text
 
 
 [138]
 Government in the Sunshine Act, Sec. 2, Pub.L. No. 94-409, 90 Stat. 1241, 1241 (1976)
 
 
 [139]
 5 U.S.C. Sec. 552b(b) (1976). An "agency" is any agency as defined in FOIA, id. Sec. 552(e), that is "headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate, and any subdivision thereof authorized to act on behalf of the agency." Id. Sec. 552b(a)(1)
 
 
 [140]
 Id. Sec. 552b(c)(1)-(10)
 
 
 [141]
 Id. Sec. 552b(a)(2). The ambiguity of this definition has frequently been noted. See, e.g., R. BERG & S. KLITZMAN, AN INTERPRETIVE GUIDE TO THE GOVERNMENT IN THE SUNSHINE ACT 3-4 (1978) ("Defining the scope of the term 'meeting' is one of the most troublesome problems in interpreting and applying the Sunshine Act. The definition was revised frequently during the course of the legislative process, sometimes for obscure reasons, and the legislative history is not completely consistent.") (footnote omitted)
 
 
 [142]
 5 U.S.C. Sec. 552b(h)(1) (1976)
 
 
 [143]
 Id. Sec. 552b(a)(2)
 
 
 [144]
 H.R.REP. NO. 880 (Part 1), 94th Cong., 2d Sess. 7 (1976), U.S.Code Cong. & Admin.News 1976, pp. 2183, 2189 [hereinafter cited as "House Report I"]; S.REP. NO. 354, 94th Cong., 1st Sess. 17, 19 (1975) [hereinafter cited as "Senate Report"]. See also 5 U.S.C. Sec. 552b(a)(1) (1976) ("agency" includes "any subdivision thereof authorized to act on behalf of the agency")
 
 
 [145]
 That section provides that "the Commission may, by published rule or by order, delegate any of its functions ... to a panel of commissioners, an individual commissioner, an employee board, or an individual employee, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter ...." We discuss the delegation question infra Part V-C
 
 
 [146]
 DOJ Brief at 24; see also supra notes 23, 37-39, and accompanying text
 
 
 [147]
 See supra notes 24-25 and accompanying text
 
 
 [148]
 DOJ Brief at 24; see also Rulemaking Denial, supra note 7, 77 F.C.C.2d at 883
 
 
 [149]
 See supra notes 37-39 and accompanying text
 
 
 [150]
 5 U.S.C. Sec. 552b(a)(2) (1976)
 
 
 [151]
 DOJ Brief at 24; see also Rulemaking Denial, supra note 7, 77 F.C.C.2d at 883-84, 886
 
 
 [152]
 Compare 5 U.S.C. Sec. 551(13) (1976). See House Report I, supra note 144, at 8; see also Pacific Legal Found. v. Council on Envtl. Quality, 636 F.2d 1259, 1264-65 (D.C.Cir.1980) (formulating and rendering advice to the President is official agency business)
 
 
 [153]
 Senate Report, supra note 144, at 18 (emphasis added). See also H.R.REP. NO. 1441 & S.REP. NO. 1178, 94th Cong., 2d Sess. 11, U.S.Code Cong. & Admin.News 1976, p. 2183 (1976) (adopting "the Senate definition, as explained in the Senate report") [hereinafter cited as "Conference Report"]
 
 
 [154]
 House Report I, supra note 144, at 7, U.S.Code Cong. & Admin.News 1976, p. 2189; Senate Report, supra note 144, at 17
 
 
 [155]
 See Rulemaking Denial, supra note 7, 77 F.C.C.2d at 883 ("The Consultative Process ... provides a valuable if not indispensable source of information ... because it facilitates our predictive judgment as to future foreign communications needs and the solutions to those needs that will be acceptable to other countries ...."); see also supra notes 37-39 and accompanying text; sources cited supra note 16
 
 
 [156]
 District Court Opinion at 7, reprinted in JA at 154. Our conclusion is buttressed by the Commission's contradictory argument in the FOIA count that documents generated from the meetings are predecisional materials. See supra notes 122, 126, 132, and accompanying text
 
 
 [157]
 See supra notes 24-25 and accompanying text
 
 
 [158]
 The Senate Report emphasizes that "the mere setting of the gathering is not determinative .... [M]eetings outside the agency are equally subject to the bill if they discuss agency business and otherwise meet the requirements of this subsection. The test is what the discussion involves, not where or how it is conducted." Senate Report, supra note 144, at 18-19
 
 
 [159]
 House Report I, supra note 144, at 8, U.S.Code Cong. & Admin.News 1976, p. 2190
 
 
 [160]
 Id.; see also Senate Report, supra note 144, at 18
 
 
 [161]
 House Report I, supra note 144, at 8; Senate Report, supra note 144, at 18. The Senate Report states that the phrase "also excludes instances where a single agency head, authorized to conduct a meeting on behalf of the agency, or to take action on behalf of the agency, meets with members of the public, or staff." Senate Report, supra note 144, at 18
 
 
 [162]
 We note in passing that the Commission's Sunshine Act regulations define a "meeting" as "the deliberations among a quorum of the Commission, a Board of Commissioners, or a quorum of a committee of Commissioners." 47 C.F.R. Sec. 0.601(b) (1981) (emphasis added). To the extent that the word "among" may be designed to exempt hearings or meetings with the public that result in the conduct of official agency business, its use violates Congress's intent. See supra notes 151-61 and accompanying text
 
 
 [163]
 Senate Report, supra note 144, at 19. The reference is to informal discussions between two members of a three-member agency; the passage "necessarily has broader application," exempting such discussions among a quorum of members, regardless of agency size. R. BERG & S. KLITZMAN, supra note 141, at 6
 
 
 [164]
 See Appendix C of R. BERG & S. KLITZMAN, supra note 141, at 116-17, for a chronological chart of the evolving definition of "meeting."
 
 
 [165]
 House Report I, supra note 144, at 35 (additional views of Rep. Horton); H.R.REP. NO. 880 (Part 2), 94th Cong., 2d Sess. 38 (1976) (additional views of Reps. Moorhead & Kindness) [hereinafter cited as "House Report II"]; 122 CONG.REC. 24,183 (1976) (remarks of Rep. Horton); id. at 24,188-89 (remarks of Rep. McCloskey)
 
 
 [166]
 122 CONG.REC. 24,189-90 (1976) (remarks of Rep. McCloskey); id. at 24,193 (remarks of Rep. Ashley)
 
 
 [167]
 Id. at 24,189 (remarks of Rep. McCloskey); id. at 24,203 (remarks of Rep. Horton)
 
 
 [168]
 Id. at 24,203 (remarks of Rep. McCloskey)
 
 
 [169]
 See, e.g., id. at 24,193 (remarks of Rep. Collins); id. at 24,203 (remarks of Rep. Brooks); id. at 24,204 (remarks of Rep. Abzug); id. (remarks of Rep. Flowers)
 
 
 [170]
 Senate Report, supra note 144, at 19
 
 
 [171]
 See also R. BERG & S. KLITZMAN, supra note 141, at 8 (Senate Report's language excludes "briefings to" and "exploratory talks among agency members") (emphasis added); id. at 8 n. 13 (citing agency regulations). The Department of Justice has in the past interpreted "meeting" to include "a 'briefing session' attended by at least the number of agency members required to take action on behalf of the agency, where the members attending have an opportunity to ask questions or seek clarification of matters of concern." Department of Justice Letter to Covered Agencies (Apr. 19, 1977), reprinted in R. BERG & S. KLITZMAN, supra note 141, at 120-21 (Appendix E)
 The Conference Committee's substitution of the phrase "determine or result in" for the word "concern," see Conference Report, supra note 153, at 11, also supports this reading. See 122 CONG.REC. 28,474 (1976) (remarks of Rep. Fascell) ("This language is intended to permit casual discussions between agency members that might invoke the bill's requirements under the less formal 'concern' standard.") (emphasis added).
 
 
 [172]
 See 122 CONG.REC. 24,204 (1976) (remarks of Rep. Abzug); supra notes 165-68, 171, and accompanying text
 
 
 [173]
 The Commission argues, for example, that it initiated the closed meetings "because [we] recognized the need for a neutral forum for talks which did not create the impression that the Europeans were subject to U.S. regulatory processes." FCC Brief at 30 n. 24. Affirmance of the district court's judgment, the Commission warns, "would be inconsistent with the desired impression." Id. See also DOJ Brief at 25-26; Demory Affidavit p 8 ("The Europeans appreciate the opportunity to communicate with us directly and prefer this to [discussions] through diplomatic channels. In my opinion, the District Court's order will limit this direct contact and will have a decidedly negative impact on our relations with foreign administrations."), reprinted in DOJ Brief at 4a
 
 
 [174]
 DOJ Brief at 26
 
 
 [175]
 See, e.g., 2A C. SANDS, STATUTES AND STATUTORY CONSTRUCTION Sec. 47.23-.25 (4th ed. 1973 & 1982 Cum.Supp.)
 
 
 [176]
 We express no views as to whether either of these exemptions could properly be invoked to close the CP discussions
 
 
 [177]
 Pacific Legal Found. v. Council on Envtl. Quality, supra note 152, 636 F.2d at 1265
 
 
 [178]
 Id
 
 
 [179]
 The Commission on appeal has relied heavily on the Lee and Demory affidavits, see supra notes 19, 25, in support of its characterization of the closed CP sessions. Neither affidavit was submitted until after the district court had rendered its decision. We look with great disfavor on such post hoc attempts to supplement the record. See, e.g., Coastal States Gas Corp. v. Department of Energy, supra note 96, 617 F.2d at 859 n. 6. In any event, the affidavits are vague, conclusory, and contradictory. Lee's affidavit, for example, largely parrots the language of the statute and legislative history. See Lee Affidavit p 3 (Lee did not "take any action on behalf of the Commission," "submit ... recommendations," or "conduct any hearings at such meetings on behalf of the agency"), reprinted in JA at 587-88. Lee's assertions also flatly contradict the Commission's conceded purpose for holding the meetings. Compare id. (Lee did not "seek to have the participants ... agree to ... take any specific actions regarding any particular telecommunications policies"), reprinted in JA at 588, with supra notes 24-25 and accompanying text. Similarly, Demory's affidavit alleges in conclusory terms that the CP meetings "must be off the record" if they are "to be truly useful in providing a vigorous exchange of views." Demory Affidavit p 5, reprinted in DOJ Brief at 3a. In line with our FOIA decisions, we believe that such conclusory affidavits, even if properly considered at this juncture, are wholly inadequate to sustain the Commission's burden of proof. See Coastal States Gas Corp. v. Department of Energy, supra note 96, 617 F.2d at 861
 
 
 [180]
 5 U.S.C. Sec. 706(2)(A) (1976). See also id. Sec. 706(2)(C)-(D) (reviewing court must set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law")
 
 
 [181]
 Natural Resources Defense Council, Inc. v. SEC, supra note 67, 606 F.2d at 1049
 
 
 [182]
 Id. (footnote omitted)
 
 
 [183]
 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). See generally Home Box Office, Inc. v. FCC, 567 F.2d 9, 34-36 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 375, 392-94 (D.C.Cir.1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974)
 
 
 [184]
 WWHT, Inc. v. FCC, 656 F.2d 807, 818 (D.C.Cir.1981)
 
 
 [185]
 See, e.g., id. at 819-20 (denial of rulemaking petition re regulation of local subscription television stations); Natural Resources Defense Council, Inc. v. SEC, supra note 67, 606 F.2d at 1046, 1049, 1053 (same re corporate disclosure of environmental and equal employment policies); Action for Children's Television v. FCC, 564 F.2d 458, 479-80 (D.C.Cir.1977) (same re television programming for children)
 
 
 [186]
 Natural Resources Defense Council, Inc. v. SEC, supra note 67, 606 F.2d at 1048, 1053 (agency compliance with National Environmental Policy Act); see also Geller v. FCC, 610 F.2d 973, 978-80 (D.C.Cir.1979) (per curiam) (agency refusal to consider effect of new legislation on earlier regulations); NAACP v. FPC, 520 F.2d 432, 435-46 (D.C.Cir.1975) (agency jurisdiction), aff'd, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976); National Org. for Reform of Marijuana Laws (NORML) v. Ingersoll, 497 F.2d 654, 659 (D.C.Cir.1974) (scope of agency authority)
 
 
 [187]
 See, e.g., Vermont Yankee Nuclear Power Corp., Inc. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 543-48, 98 S.Ct. 1197, 1211-13, 55 L.Ed.2d 460 (1978); American Trucking Ass'ns v. United States, 627 F.2d 1313, 1321 (D.C.Cir.1980)
 
 
 [188]
 The Commission so argues on appeal, see FCC Brief at 26-27, but the proposals' "unworkability" did not form the basis for the Commission's rulemaking denial. See Rulemaking Denial, supra note 7, 77 F.C.C.2d at 887-88. Indeed, the Commission seems to have believed that the proposals are generally sound, for it promised to follow most of them, albeit without the adoption of formal regulations, in future CP meetings. Id. at 888
 
 
 [189]
 Citizens to Preserve Overton Park, Inc. v. Volpe, supra note 183, 401 U.S. at 415, 91 S.Ct. at 823
 
 
 [190]
 Dunlop v. Bachowski, 421 U.S. 560, 571, 95 S.Ct. 1851, 1859, 44 L.Ed.2d 377 (1975) (citation omitted)
 
 
 [191]
 See supra notes 40-41 and accompanying text
 
 
 [192]
 See Red Lion Broadcasting Co., Inc. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969)
 
 
 [193]
 See, e.g., Dunlop v. Bachowski, supra note 190, 421 U.S. at 571, 95 S.Ct. at 1859; Citizens to Preserve Overton Park, Inc. v. Volpe, supra note 183, 401 U.S. at 419-20, 91 S.Ct. at 825; cases cited supra note 186
 
 
 [194]
 "Record" is something of a misnomer, as the Commission chose not to conduct rulemaking. The "record" here consists simply of the petition, comments, and denial. The Commission has argued, however, that "[t]his case has an administrative record more than amply detailed enough to permit this Court to review the agency decision in a routine manner." DOJ Brief at 14
 
 
 [195]
 See, e.g., Camp v. Pitts, 411 U.S. 138, 142-43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); United States Lines, Inc. v. Federal Maritime Comm'n, 584 F.2d 519, 532-33 (D.C.Cir.1978); Moss v. CAB, supra note 66, 430 F.2d at 900
 
 
 [196]
 See supra notes 22-26, 66, and accompanying text
 
 
 [197]
 Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)
 
 
 [198]
 See, e.g., Rulemaking Petition at 5, reprinted in JA at 20; Reply Comments of ITT World Communications, Inc., at 3-4 (Jan. 8, 1980), reprinted in JA at 118-19. See also supra notes 22-26 and accompanying text
 
 
 [199]
 See, e.g., Home Box Office, Inc. v. FCC, supra note 183, 567 F.2d at 35-36 & n. 58; Portland Cement Ass'n v. Ruckelshaus, supra note 183, 486 F.2d at 393-94
 
 
 [200]
 Rulemaking Denial, supra note 7, 77 F.C.C.2d at 887-88
 
 
 [201]
 See Records Denial, supra note 76, Attachment II, 76 F.C.C.2d at 460 (items 5, 7, 8 and 10); Frisby Affidavit p 3, reprinted in JA at 340-41. See also Rulemaking Petition at 9-10 (listing open docket proceedings), reprinted in JA at 24-25
 
 
 [202]
 See Transcript of FCC Open Meeting, at 1 (Apr. 22, 1980) (remarks of David Bass concerning preliminary draft of rulemaking denial) ("We do have some changes to make in the draft before you now both on our undertaking and at the suggestion of the General Counsel's Office to strike from this order and help it coordinate with the collateral court suit that ITT has filed in the District Court ...."), reprinted in JA at 135. See also the colloquy between Commissioner Abbott Washburn and General Counsel Robert Bruce, id. at 6, reprinted in JA at 140:
 Washburn: Why do we have to address this here, Mr. Chairman. Why can't we get at it in some other context. Let's get rid of this tiem [sic ] without addressing this matter at this point.
 Bruce: Commissioner Washburn, I think it's probably useful that we deal with this petition at this time because of the pending litigation in the District Court.
 
 
 [203]
 See, e.g., Camp v. Pitts, supra note 195, 411 U.S. at 143, 93 S.Ct. at 1244; United States Lines, Inc. v. Federal Maritime Comm'n, supra note 195, 584 F.2d at 532-33; Greater Boston Television Corp. v. FCC, supra note 197, 444 F.2d at 850
 
 
 [204]
 See supra Part II-A
 
 
 [205]
 See supra notes 50-51 and accompanying text
 
 
 [206]
 See supra notes 52-54 and accompanying text
 
 
 [207]
 See supra notes 181-90, 192-202, and accompanying text
 
 
 [208]
 See Citizens to Preserve Overton Park, Inc. v. Volpe, supra note 183, 401 U.S. at 420, 91 S.Ct. at 825
 
 
 [209]
 47 U.S.C. Sec. 155(d)(1) (1976). See supra note 145
 
 
 [210]
 Specifically, the Committee is authorized to act upon all section 214 and 319 common carrier applications, where the cost of construction or value of the facilities exceeds $10 million. 47 C.F.R. Sec. 0.215 (1981)
 
 
 [211]
 See, e.g., Home Box Office, Inc. v. FCC, supra note 183, 567 F.2d at 57; see also Association of Nat'l Advertisers, Inc. v. FTC, 627 F.2d 1151, 1169 (D.C.Cir.1979), cert. denied, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980)
 
 
 [212]
 See 47 C.F.R. Sec. 0.204(a) (1981) ("Any official (or group of officials) to whom authority is delegated in this subpart is authorized to issue orders ... pursuant to such authority and to enter into general correspondence concerning any matter for which he is responsible under this subpart ....") (emphasis added). We intimate no views on the proper scope of such dialogues
 
 
 [213]
 See Rulemaking Denial, supra note 7, 77 F.C.C.2d at 886 & n. 10; FCC Brief at 15; DOJ Brief at 23 & n. 10; FCC District Court Memorandum at 23 ("The only type of business the Telecommunications Committee may engage in, the consideration of common carrier applications, does not arise at these conferences."), reprinted in JA at 513
 
 
 [214]
 FCC Brief at 32 n. 26
 
 
 [215]
 See supra notes 22-26, 146-49, 155-57, and accompanying text